### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

**SCOTT J. ISRAEL,**

     *Plaintiff*,

**v.**                                             **CASE NO.: 4:19cv576-MW/MAF**

**RON DESANTIS, in his capacity**
**as Governor of Florida, and**
**BILL GALVANO, in his capacity**
**as President of the Florida**
**Senate,**

     *Defendants*.

_____/

### <u>ORDER GRANTING MOTIONS TO DISMISS</u>

In this due process case, Plaintiff, the former Sheriff of Broward County, Florida, challenges the means by which he was removed from that office. Defendants move to dismiss the complaint, on a variety of grounds. ECF Nos. 23 & 24.

At this stage of litigation, this Court must accept as true the facts as alleged in the complaint. *See, e.g.*, *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). Here, in brief, is what Plaintiff says happened. On January 11, 2019, Defendant DeSantis suspended Plaintiff by executive order on grounds of "neglect of duty and incompetence in connection with two mass shooting events in Broward County,"

namely the 2017 Fort Lauderdale-Hollywood International Airport shooting and the 2018 Marjory Stoneman Douglas High School shooting.  ECF No. 1 at 7; *see also* ECF No. 2-1 (Executive Order 19-14).   In his executive order of suspension, Defendant DeSantis laid at Plaintiff's feet the blame for several alleged operational and organizational failures relating to the two shootings, which together resulted in twenty-two deaths. *Id.*  The Supreme Court of Florida upheld the suspension.  *Israel v. DeSantis*, 269 So. 3d 491 (Fla. 2019).  Plaintiff invoked the Florida Senate's power to review his suspension and either reverse it or remove him permanently from office.  ECF No. 1 at 7.

As provided by the Florida Senate's rules, Plaintiff first had an adversarial hearing before a Senate-appointed Special Master in which both Plaintiff and Defendant DeSantis participated through counsel. *Id.* at 9–11.  During this two-day hearing, the parties had the opportunity "to present all relevant information and evidence, cross-examine witnesses, and make argument" to the Special Master. *Id.* at 10.   Plaintiff introduced live testimony from four witnesses and deposition transcripts of nine more, and between them Plaintiff and Defendant DeSantis introduced more than fifty evidentiary exhibits. *Id.*   The Special Master then submitted a Report and Recommendation to the Florida Senate, recommending Plaintiff be reinstated. *Id.* at 11.  The Florida Senate referred the Report and Recommendation to its Rules Committee for consideration, and the Rules

Committee in turn scheduled a day-long public meeting for October 21, 2019. *Id.* at 12. In its scheduling letter, the Rules Committee specifically explained that the meeting was "a meeting of the Rules Committee and not an evidentiary hearing." *Id.*

On October 11, 2019—ten days before the Rules Committee meeting—the Special Counsel to the Florida Senate advised Plaintiff and Defendant DeSantis that they should submit any "new information" for the Rules Committee's consideration. *Id.*; *see also* ECF No. 86-10 at 2 (letter to Plaintiff's counsel from Special Counsel, copied to Defendant DeSantis's counsel). This letter also informed the parties that "[t]here is no statute or rule prohibiting the parties, or any other person, from discussing the merits of any suspension case with an individual Senator." *Id.* Plaintiff objected to this alleged change in the Florida Senate's rules, which permitted consideration of information not presented to the Special Master and "*ex parte*" communications between the parties and individual Senators. ECF No. 1 at 13. Before the Rules Committee meeting, Defendant DeSantis submitted two supplemental investigative reports and an additional memorandum presenting new argument beyond that presented to the Special Master. *Id.* Plaintiff claims the Rules Committee considered this "new information" without providing him "any meaningful opportunity to investigate, contest, or respond to the information." *Id.* at 14. Plaintiff also claims the Rules Committee considered "highly objectionable

3

material" including, among other things, "an 'alter-ego' doctrine" that Plaintiff alleges Defendant DeSantis never advanced before that point; allegations withdrawn by Defendant DeSantis concerning a county radio system with which Plaintiff had no connection; "assertions and arguments made by members of the public whose information was not noticed to [Plaintiff];" and "unknown but admitted *ex parte* communications by the Governor's Office with individual Senators." *Id.* at 14–15. The Florida Senate then convened in special session and held a floor debate on Plaintiff's suspension, which Plaintiff alleges contained the same flaws as the Rules Committee hearing. *Id.* at 15–16. At the conclusion of the debate, the Florida Senate voted to permanently remove Plaintiff from office. *Id.* at 16.

Plaintiff claims "the combined official actions of the Governor and Senate" deprived him of due process of law by infringing on his property and liberty interests in serving as Sheriff of Broward County. ECF No. 1 at 23, 26. Plaintiff seeks declaratory and injunctive relief, and asks this Court to not just reverse the Florida Senate's decision to make his suspension permanent but to order that he be reinstated into office. *See generally* ECF No. 1. Defendants move to dismiss the complaint because, among other bases, it fails to state a claim for which relief can be granted, because Plaintiff lacks standing to sue Defendant DeSantis, and because Defendant Galvano is entitled to legislative immunity.

4

This Court understands why Plaintiff, believing the blame for numerous brutal murders has been unfairly and undeservedly laid at his feet, might feel wronged.  He believes he was first scapegoated and then railroaded, without a fair chance to defend himself.  But the issue in this case is not whether Defendants made the right decision in removing Plaintiff from office, and this Court is not a forum to relitigate the merits of Plaintiff's suspension and removal.  The issue also is not whether the process Plaintiff received was perfect or could have been fairer or more robust, nor whether it conformed to Florida law.  The sole issue before this Court is whether the process Plaintiff alleges he received satisfies the requirements of the Due Process Clause.

As explained below, having considered Defendants' motions and Plaintiff's responses, and after hearing on March 27, 2020, this Court concludes Defendants' motions are due to be **GRANTED IN PART AND DENIED IN PART**, but that those portions due to be granted are dispositive of the case and therefore Plaintiff's complaint must be **DISMISSED** in its entirety.

### Note on Procedural Posture

This case is before this Court on Defendants' motions to dismiss.  As previously noted, this Court must, therefore, accept the well-pleaded facts of the complaint as true for purposes of this motion, resolving any ambiguity—and making any reasonable inferences—in Plaintiff's favor.  But the way Plaintiff has chosen to

plead his case forces this Court into an unusual position, one that merits explanation before proceeding further.

Plaintiff's complaint is a three-count, thirty-two-page document. ECF No. 1. Plaintiff made the choice, however, to also include, incorporate, and refer to sixty-one attachments to the complaint. *See* ECF No. 1-4 (table of attachments). Calling these attachments voluminous would be putting it mildly. Together, they comprise more than seven thousand pages of documents, ranging from the executive order suspending Plaintiff, to the transcript of the Special Master hearing, the exhibits the parties submitted during that hearing, the transcript of the Rules Committee meeting, and the transcript of the Florida Senate's floor debate. *See* ECF Nos. 2, 4, 7, 14–19, and 61–90 (attachments to complaint).[1] These attachments are considered part of the pleadings and are therefore properly before this Court when considering the instant motions. *See Solis-Ramirez v. U.S. Dep't of Justice*, 758 F. 2d 1426, 1430 (11th Cir. 1985). In practical terms, therefore, Plaintiff filed a more than *seven-thousand-page* complaint.

---

[1] The attachments also include lengthy video recordings, such as those of the Special Master hearing, the Rules Committee meeting, and the Florida Senate floor debate, as well as the transcripts of those proceedings. Only two of the recordings provided in the attachments are not transcribed; namely, the Special Master's telephonic case management conference, ECF No. 2-20, and the Special Master's prehearing conference, ECF No. 4-10, which combined amount to roughly an hour and a half of video. For the sake of convenience and ease of reference, this Court will cite to a transcript where Plaintiff has provided one.

Plaintiff's choice to plead his case in this way has an important legal consequence. "Where there is conflict between allegations in a pleading and exhibits thereto, it is well settled that the exhibits control." *Friedman v. Market Street Mortg. Corp.*, 520 F.3d 1289, 1295 n.6 (11th Cir. 2008) (quoting *Tucker v. Nat'l Linen Serv. Corp.*, 200 F.2d 858, 864 (5th Cir. 1953)). "The classic example is when a plaintiff attaches a document to his complaint but his allegations about what the document is or says contradict the document itself." *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016). In other words, by choosing to include the entire record of the suspension and removal proceedings as attachments to the complaint, Plaintiff forces this Court into the unusual posture of having to accept his allegations as true, and to draw all reasonable inferences in his favor, except to the extent the attachments he has provided contradict his pleadings or foreclose those inferences. If all that were before this Court were ECF No. 1, and nothing else, this Court's analysis of the pending motions might look different. But, because Plaintiff chose to provide this Court with such a voluminous body of attachments, and because those attachments are part of the complaint for purposes of the instant motions, Plaintiff has forced upon this Court the obligation to defer to the contents of those attachments where they conflict with his complaint.

This Court provides this notation to clarify what it is and is not doing. This Court is not converting the instant motions into a summary-judgment posture, which

would entail providing the parties with prior notice and an opportunity to submit additional facts. *See* Fed. R. Civ. P. 12(d) (providing that, if matters outside the pleadings are presented, "the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.").  As explained above, the attachments Plaintiff included with his complaint are not "outside the pleadings" at all, and so Rule 12(d) does not apply here.  Because the case is in a motion-to-dismiss posture and not a summary-judgment posture, this Court does not ask whether a reasonable finder of fact could conclude Plaintiff was entitled to relief, and it does not weigh the evidence.  Although in the course of analyzing Plaintiff's allegations, this Court may on occasion write that the attachments "show," "reflect," or "demonstrate" a thing, or employ other such convenient terms, the reader should not be misled by that choice of words into concluding this Court is finding facts or operating in a summary judgment posture.  Rather, when this Court adopts those rhetorical conveniences, it does so to avoid repeating ad nauseam the lengthy qualifying statement that the attachments to Plaintiff's complaint are allegations, though not of the same legal character as the allegations in the text of the complaint itself.  The question for this Court to consider here is, has Plaintiff stated a claim for which relief could be granted, accepting the well-pleaded facts as true to the extent they do not

conflict with the attachments, and making all reasonable inferences in Plaintiff's favor to the extent they are not foreclosed by the attachments?

With this unusual procedural posture in mind, this Court will now proceed to analyze Defendants' motions.

### Plaintiff Lacks Standing to Sue Defendant DeSantis

Defendant DeSantis argues, in part, that Plaintiff cannot show redressability as to him, and thus Plaintiff lacks standing to sue him. ECF No. 24 at 22–23. This Court agrees.

Implicit in Article III of the United States Constitution is the doctrine of standing, which requires, among other things, that a decision in the plaintiff's favor will likely redress the injury at issue. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (explaining the doctrinal underpinnings and elements of standing). On the facts of this specific case, there is no remedy this Court could order as to Defendant DeSantis. Plaintiff's complaint indicates any alleged violation of his due process rights occurred only after the hearing before the Special Master, at which point Plaintiff's suspension was already fully consummated. During the March 27, 2020, telephonic hearing, this Court specifically inquired whether Plaintiff alleged any due process violation to have occurred before the Special Master issued his Report and Recommendation, and counsel for Plaintiff answered in the negative. The remedy for a denial of procedural due process is a do-over with sufficient process, not

reversal with prejudice of the substantive decision that is the outcome of said process.  *See McKinney v. Pate*, 20 F.3d 1550, 1556–57 (11th Cir. 1994) (en banc) (differentiating between violations of substantive due process, remedied by restoration of the invaded interest, and procedural due process, remedied by providing sufficient process).  And it is axiomatic that the scope of the remedy a court may order is limited to the extent of the injury the aggrieved party suffered. *See also Lujan*, 513 U.S. at 571 (analyzing redressability in terms of "the . . . injury in fact respondents complain of").[2]

Therefore, assuming Plaintiff were to prevail on the merits of every allegation in his complaint, the most this Court could do would be to vacate the Florida Senate's prior removal decision and allow the Florida Senate to address Plaintiff's issue a second time in a way that satisfies the Due Process Clause.  Defendant DeSantis does not control that process, any more than a party appearing before a court controls its procedure.  He, like Plaintiff, is a party to that process, not the arbiter of it, and this Court cannot redress any of the flaws complained of by granting relief against Defendant DeSantis.  Because a favorable judicial decision on Plaintiff's claims

---

[2] Plaintiff urges that the appropriate remedy for him is not that he receive sufficient process but rather that he be outright reinstated.  Plaintiff attempts to circumvent the complete absence of legal authority supporting this contention by arguing that his case is "unique" and such relief is therefore justified.  Article III of the United States Constitution does many things, but it does not give this Court plenary appellate jurisdiction over Florida's suspension and removal process.  The reasoning behind Plaintiff's prayer for relief is certainly unique, but it is without support in the law.

against Defendant DeSantis would not redress Plaintiff's injury, Plaintiff lacks standing to sue Defendant DeSantis. *See also id.* (concluding the redressability element was not satisfied because providing relief against the Secretary of the Interior in that suit would not likely remedy the claimed injury).

Notwithstanding Plaintiff's lack of standing to sue Defendant DeSantis on the facts of this particular case, it is important to clarify that circumstances could exist in which a public official suspended pursuant to article IV, section 7(a) of the Florida Constitution would have standing to sue the governor for a violation of procedural due process. Defendant DeSantis's argument that a gubernatorial suspension is not a final action, and therefore a suspended public official would never have standing to sue the governor who suspended them, *see* ECF No. 24 at 21, misses the mark. Not only is a permanent deprivation not required to establish injury for due process purposes, *Reams v. Scott*, No. 4:18cv154-RH/CAS, 2018 WL 5809967, at *2 (N.D. Fla. Nov. 6, 2018) (Hinkle, J.) (citing *Bailey v. Bd. of Cty. Comm'r of Alachua Cty.*, 956 F.2d 1112, 1122 (11th Cir. 1992)), but it is not difficult to imagine realistic circumstances in which a gubernatorial suspension could be permanent for all practical purposes. *See Reams*, 2018 WL 5809967 at *1–*2 (granting relief where the governor had suspended an official without a hearing and the Florida Senate had not acted, leaving the official "suspended" for more than a year). Similarly, if the governor were to suspend an official at such a time as to virtually guarantee that the

11

Florida Senate would not sit—either in regular session or a special session—in time to consider removing or reinstating that official before the end of their term in office, that suspension would be effectively final. *See Snipes v. Scott*, No. 4:18cv580-MW/CAS, 2019 WL 163352 (N.D. Fla. Jan. 10, 2019) (Walker, C.J.). *Fair v. Kirk*, 317 F. Supp. 12 (N.D. Fla. 1970), is not to the contrary. In that case, a three-judge panel ruled the failure to accord a public official a hearing prior to their suspension by the governor did not violate the Due Process Clause. *Id.* at 15 (explaining the official "assert[ed] merely that the governor should have given him notice and an opportunity to be heard before suspending him"). Fair had received a hearing before the Florida Senate's Select Committee on Executive Suspensions, which resulted in his removal from office, and his due process challenge was centered on the governor's failure to grant him a hearing before his suspension. *Id.* at 14. The court in *Fair* went on to explain that "[n]either Fair nor any other plaintiff in his position suffers from irreparable harm as a result of the suspension," *id.* at 17, but the court explicitly conditioned that statement on the fact that a suspended official "may still plead his case in the senate during removal proceedings." *Id.* The plaintiff in *Fair* had an opportunity to clear his name before the Florida Senate, and so the governor was not required to accord him the protection of a pre-suspension hearing. But if there is no removal proceeding, there is no opportunity to be heard, and the deprivation is effectively permanent.

As far as the present case is concerned, however, Plaintiff cannot satisfy the redressability element of standing as to Defendant DeSantis on any of the three counts in the complaint.  Accordingly, the complaint must be **DISMISSED** as against Defendant DeSantis.  Because the elements of standing are conjunctive, a failure to show any one element is dispositive and this Court need not reach the issue of whether Plaintiff can show injury-in-fact or causation.  *But see infra* note 5.

## This Case is Justiciable

Although this Court has concluded this action must be dismissed in its entirety as to Defendant DeSantis, his motion to dismiss also argues this case as a whole presents a non-justiciable issue.  ECF No. 24 at 23–26.  Defendant DeSantis raises the issue of justiciability in such an expansive way that it implicates this Court's ability to decide this case as to Defendant Galvano as well, even though Defendant Galvano does not raise it.  Therefore, because Defendant DeSantis puts into question this Court's ability to decide this case as a whole, this Court will address that argument, even though it does not affect the resolution of Plaintiff's claims against Defendant DeSantis.

Specifically, Defendant DeSantis asserts this case presents a non-justiciable political question, but the substance of his argument does not implicate the political question doctrine.  "The nonjusticiability of a political question is primarily a function of the separation of powers."  *Baker v. Carr*, 369 U.S. 186, 210 (1962).

13

That is, "it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question.' " *Id.* Instead, what Defendant DeSantis's argument implicates are principles of federalism and comity—which, despite its homophone, is no laughing matter. These considerations spring from

> a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in separate ways. [. . .] [T]he concept [represents] a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

*Younger v. Harris*, 401 U.S. 37, 44 (1971). Defendant DeSantis does not ask this Court to abstain pursuant to *Younger*; nor could he in this context. *See id.* at 49–54 (explaining the applicability of *Younger* abstention). But Defendant DeSantis does contend this Court should not even consider whether to interfere in Florida's suspension and removal process in the absence of extraordinary or exceptional facts. In effect, Defendant DeSantis argues that, because the issue in this case is a state's procedure for removing a state official, and the facts are not shocking or extreme, this Court should not intervene in Florida's internal affairs. Defendant DeSantis relies heavily on three cases for support, but that reliance is, in each instance, misplaced.

14

First is *Wilson v. North Carolina*, 169 U.S. 586 (1898).  In that case, as

Defendant DeSantis correctly points out, the Court stated that

> [t]he procedure provided by a valid state law for the purpose of
> changing the incumbent of a state office will not, in general, involve
> any question for review by this court.  [. . .]  The facts would have to be
> most rare and exceptional which would give rise in a case of this nature
> to a federal question.

*Id.* at 593.  The Court also explained, however, that the rights of a state officeholder

"are to be measured by the statute and by the constitution of the state, excepting in

so far as they may be protected by any provision of the federal constitution."  *Id.* at

592.  It went on to explain that federal jurisdiction would exist if the removal process

had involved

> such a plain and substantial departure from the fundamental principles
> upon which our government is based that it could with truth and
> propriety be said that, if the judgment were suffered to remain, the party
> aggrieved would be deprived of his life, liberty, or property in violation
> of the provisions of the federal constitution.

*Id.* at 596.  In plain English, the government taking a person's life, liberty, or

property without due process of law is such a ghastly wrong that the injured party

can seek relief in federal court, even though the party is a state official who has been

removed from office through a state-law procedure.  Plainly, *Wilson* allows federal

courts to consider precisely the type of claims at issue in this case.

Second is *Taylor v. Beckham*, 178 U.S. 548 (1900).  In that case, the Court

considered whether the removal of an official by the Kentucky General Assembly

violated "the guarantee of the Federal Constitution of a republican form of government . . . and deprived [the people of Kentucky] of their political liberty without due process of law." *Id.* at 574. Unlike the present case, where this Court has original jurisdiction over the cause of action as a federal question, ECF No. 1 at 4–5, *Taylor* was before the Supreme Court of the United States on a writ of certiorari to the Kentucky Court of Appeals. 178 U.S. at 561. The Supreme Court ultimately concluded it lacked jurisdiction to review the state court's decision, citing *Wilson* and explaining that a state's highest court's determination concerning "the construction and validity" of a state law that "does but provide for the carrying out and enforcement of the policy of the state with reference to its political and internal administration . . . will generally be conclusive here." *Id.* at 573. But the Court again clarified, as it did in *Wilson*, that although it is "essential to the independence of the states" that they regulate their own officeholders, they may only do so "except so far as plainly provided by the Constitution of the United States." *Id.* at 571. This merely restates the well-known principle that, despite their considerable autonomy, state governments may not violate the Constitution. *See also* U.S. Const., Art. IV, § 2 (providing the Constitution "shall be the supreme Law of the Land"). So, *Taylor* does not support Defendant DeSantis's argument, either.

Third, and finally, is the Eleventh Circuit's en banc decision in *McKinney*. The claim in *McKinney* arose out of the alleged wrongful termination of a county

employee, not the executive suspension of an elected public officer, and so the cases would not be entirely on all fours even assuming Defendant DeSantis's reading were correct. But that is beside the point, because Defendant DeSantis misreads *McKinney*. Defendant DeSantis is correct that the Eleventh Circuit noted the "appropriate forum" to resolve the underlying injury in that case was a state court rather than a federal court; but it is error to suggest the Eleventh Circuit held, implied, or even appeared to contemplate that statement as bearing on justiciability. The Eleventh Circuit did state in *McKinney* that "the appropriate forum for addressing McKinney's claim is not federal court but a Florida state court," but it then went on to explain "that forum might well have prevented a violation of McKinney's procedural due process rights and thereby obviated the need for this suit." 20 F.3d at 1561. Thus, the Eleventh Circuit reasoned, its "next task [was] to determine whether the procedure afforded McKinney satisfied constitutionally mandated due process minima." *Id.* The Eleventh Circuit identified Florida courts as the proper forum for a separate, prophylactic state-law remedy which could have removed the need for a federal due process lawsuit, and then went on to consider McKinney's due process claim on its merits. The Eleventh Circuit did not, in any way, conclude public officials' procedural due process claims were non-justiciable.

In summary, then, the cases Defendant DeSantis cites do not support the conclusion that Plaintiff's claims are non-justiciable. If anything, they do the

opposite by clearly demonstrating that, in the past, federal courts have considered and ruled upon the merits of such claims. This Court concludes Plaintiff's claims are justiciable, and Defendant DeSantis's motion is **DENIED IN PART** as to this issue.

### Legislative Immunity Not Applicable

The last preliminary matter for this Court to address is Defendant Galvano's invocation of the doctrine of legislative immunity. Defendant Galvano contends the decision to permanently remove Plaintiff from office was a legislative decision, and therefore legislative immunity should apply to bar this lawsuit. This Court disagrees.

It is true that state legislators, like national legislators, are immune from suit for their legislative acts. *Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1061–62 (11th Cir. 1992) (collecting Supreme Court precedent on the subject). An act is not, however, considered a legislative act for immunity purposes merely because the actor is a legislator or legislature. Legislative immunity only applies to "acts necessary to preserve the integrity of the legislative process". *United States v. Brewster*, 408 U.S. 501, 517 (1972). Although each branch of government presumptively exercises its own powers, the issue of whether actions taken by a legislative body "are, in law and fact, an exercise of legislative power depends not on their form but upon whether they contain matter which is properly to be regarded

as legislative in its character and effect." *INS v. Chadha*, 462 U.S. 919, 951–52 (1983).

It is worth noting that, under Florida law, the removal of an elected official by the Florida Senate is not considered a legislative act, but rather an executive one. *State v. Joughin*, 138 So. 392, 395 (Fla. 1931) (explaining that "[t]he power of removal [is] executive" and that it "takes the joint action of the Governor and the Senate to remove an officer; the action of the Governor being limited to suspension").[3] Although the question of whether legislative immunity applies in this case is a question of federal law, and the characterization of the action in question under Florida law is therefore of limited relevance, it is nonetheless useful to note that federal law is harmonious with Florida law in eschewing strict formalism on this subject for a more nuanced analysis of the use of official power.

To return, because legislative immunity attaches only to legislative acts, this Court must now determine whether, under *federal* law, the removal of an elected official by the Florida Senate is a legislative act. The law teaches that "[t]he essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct."

---

[3] In his appearance before the Rules Committee, Defendant DeSantis's counsel explained the Senate's removal proceeding was a use of executive power rather than legislative power. ECF No. 90-2 at 116 ("The removal and reinstatement powers are is [sic] not in Article Three. It's actually in Article Four. So you are actually acting under executive authority when you are sitting here today.").

*Yakus v. United States*, 321 U.S. 414, 424 (1944).  Defendant Galvano is correct

that, to qualify as a legislative act, the action in question must be an

> integral part of the deliberative and communicative process by which
> [legislators] participate in committee and [other legislative]
> proceedings with respect to the consideration and passage or rejection
> of proposed legislation *or with respect to other matters which the
> Constitution places within the jurisdiction of [the legislature].*

*Gravel v. United States*, 408 U.S. 606, 625 (1972) (emphasis added).  But *Gravel* is

not the end of the inquiry.  The portion of that decision quoted above stands for the

proposition that the analysis is not a rigid and inflexible one.  For example, it is not

sufficient to confer legislative immunity that the act in question be one the legislature

is constitutionally empowered to undertake, or legislatures would be immune from

any lawsuit other than a quo warranto-style challenge to an obviously illegal act.  So,

mere assignment of the function to the legislature is not dispositive.  Furthermore,

although a legislator casting their vote *can* be a legislative act, it is not always a

legislative act.  It depends whether that vote was cast on legislation or on something

else.  *Smith v. Lomax*, 45 F.3d 402, 405 (11th Cir. 1995) ("Our cases have recognized

that a legislator's vote constitutes the act of 'legislating,' and thus cloaks the

legislator with immunity, *if* the vote is cast for or against the enactment of a law."

(internal citations omitted)).  In fact, the Eleventh Circuit has "expressly rejected the

argument that the act of voting, in itself, constitutes legislative action giving rise to

immunity."  *Id.* at 406 (citing *Crymes v. DeKalb Cty.*, 923 F.2d 1482 (11th Cir.

1991)).  But *Gravel* also plainly allows legislative immunity to forestall lawsuits arising out of other official actions of a legislator or legislature, beyond the strict limits of voting on legislation.  The Eleventh Circuit has explained "the reach of the legislative immunity doctrine," *Smith*, 45 F.3d at 406, in the following terms.

> A legislative act involves policymaking rather than mere administrative application of existing policies . . ..  If the facts utilized in making a decision are specific, rather than general, in nature, then the decision is more likely administrative.  Moreover, if the decision impacts specific individuals, rather than the general population, it is more apt to be administrative in nature.

*Id.* (quoting *Crymes*, 923 F.2d at 1485) (citations omitted) (alteration in original).[4]

Applying the above principles to the present case yields the conclusion that legislative immunity does not apply here.  The decision to remove or reinstate Plaintiff was not legislation, and so the act of voting alone is not enough to trigger legislative immunity.  Furthermore, the facts involved in that decision were specific to Plaintiff rather than general in nature.  Finally, the decision's direct impact was specific to Plaintiff.  Although one could argue it also had some broader effects on

---

[4] During oral argument, Defendant Galvano argued these cases should be distinguished because they addressed local government bodies which engage in both legislative and administrative activities, wearing (so to speak) different hats at different times.  This argument is unpersuasive, as the cases do not make such a distinction, nor do they impose such a qualification on their holdings.  The precedent that binds this Court focuses on the nature of the action, not the identity of the actor.  Furthermore, state legislatures would be an odd exception to the rule, which otherwise applies to the United States Congress, *see Gravel*, 408 U.S. at 625 (concerning a United States Senator), and to local government bodies, *see Smith*, 45 F.3d at 403 (concerning a board of county commissioners), whose authority is derived from and regulated by the state in the first place.  *See Lowe v. Broward Cty.*, 766 So. 2d 1199, 1204 (Fla. 4th DCA 2000) ("As political subdivisions of the state, counties 'derive their sovereign powers exclusively from the state.' " (quoting *Hollywood, Inc. v. Broward Cty.*, 431 So. 2d 606, 609 (Fla. 4th DCA 1983))).

the public at large, allowing the existence of such attenuated secondary and tertiary effects to confer immunity would render the immunity analysis illusory, as virtually any action by a legislature or legislator would have such effects to *some* degree. Moreover, and most importantly, the decision was not, as Defendant Galvano contends, "a discretionary, policy decision regarding the qualifications of a constitutional officer to hold office." ECF No. 23 at 7. The drafting of article IV, section 7(a) certainly involved such decision-making, because the drafters of that provision had to consider what kinds of conduct should disqualify an individual from holding office. The decision to remove Plaintiff from office, however, did not involve any such abstract considerations of generally applicable policy. It involved only the question of whether Plaintiff fell into one of the enumerated categories. It applied the general policy of Florida, as expressed in the Florida Constitution, to a specific case—that of Plaintiff's removal from, or reinstatement to, the office he held. Legislative immunity does not prevent this lawsuit, and Defendant Galvano's motion is **DENIED IN PART** as to this issue.

## Plaintiff Has No Property Interest in Serving in Office

The Fourteenth Amendment protects against deprivation of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1. Count I of the complaint alleges Plaintiff was injured because he was deprived of a property interest without due process. ECF No. 1 at 23–25. Count II alleges the same injury,

but with respect to a liberty interest.  *Id.* at 26–28.  In Count III, Plaintiff seeks combined injunctive relief for invasions of both liberty *and* property interests.  *Id.* at 28–30.  Defendants argue Count I and part of Count III should be dismissed because Plaintiff cannot show he has been deprived of any property interest.[5]  This Court agrees.

Federal law does not recognize an independent property right for public officials to the offices in which they serve.  *Taylor*, 178 U.S. at 577 ("In short, generally speaking, the nature of the relation of a public officer to the public is inconsistent with either a property or a contract right.").  A public official can, however, have a property right in holding their office that the Due Process Clause will protect, to the extent state law recognizes one.  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972) ("Property interests, of course, are not created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source, such as state law . . . .").

In the past, Florida recognized such a right.  In *State v. Tedder*, 143 So. 148, 149 (Fla. 1932), the Supreme Court of Florida held "persons appointed or elected to

---

[5] Defendant Galvano raises this argument pursuant to Federal Rule of Civil Procedure 12(b)(6), while Defendant DeSantis characterizes it as a failure to satisfy the injury-in-fact element of standing.  In this context, it comes to the same thing—an inability to show a cognizable injury, whether denominated as a lack of standing or a failure to state a claim, is fatal to Plaintiff's claims.

public office have legal rights in the enjoyment of the tenure thereof which will enable them to invoke appropriate judicial proceedings for their protection when such rights are shown to have been illegally infringed upon or attempted to be unlawfully taken away."  In 1976, however, Florida amended its state constitution to add article II, section 8, which specifies that, in Florida, "[a] public office is a public trust."  Since then, the Supreme Court of Florida has held "elected officials have no property rights to the office to which they have been elected."  *In re Senate Joint Resolution of Legislative Apportionment 1176*, 83 So. 3d 597, 662 (Fla. 2012) (quoting *In re Apportionment Law–1982*, 414 So. 2d 1040, 1046 (Fla. 1982)). Although neither of the above-cited apportionment decisions specifically references article II, section 8 of the Florida Constitution, this conclusion is consistent with the idea that the primary purpose of that provision "was to impose stricter standards on public officials so as to avoid conflicts of interest."  *Plante v. Smathers*, 372 So. 2d 933, 936–37 (Fla. 1979).  Of course, the Supreme Court of Florida

> does not intentionally overrule itself sub silentio.  Where a court encounters an express holding from [the Supreme Court of Florida] on a specific issue and a subsequent contrary dicta statement on the same specific issue, the court is to apply [the Supreme Court of Florida's] express holding in the former decision until such time as [the Supreme Court of Florida] recedes from the express holding.

*Puryear v. State*, 810 So. 2d 901, 905 (Fla. 2002).  The Supreme Court of Florida goes on to explain that, when such a conflict occurs, Florida's district courts of appeal should certify the matter as a question of great public importance for the

24

Supreme Court of Florida to resolve.  *Id.*; *see also* Art. V, § 3(b)(4), Fla. Const. (granting the Supreme Court of Florida discretionary jurisdiction to review "any decision of a district court of appeal that passes upon a question certified by it to be of great public importance").  Notwithstanding the apparent conflict between *Tedder* and *Legislative Apportionment 1176*, however, and according the greatest possible respect to the Supreme Court of Florida's pronouncement in *Puryear*, this Court concludes the Supreme Court of Florida did not overrule itself *sub silentio*, but rather—for this Court's purposes in the present case—the intervening amendment to the Florida Constitution removed any need for the Supreme Court of Florida to do so.  It would be strange indeed for this Court to conclude each specific provision of the Florida Constitution only has legal force and effect once explicitly granted it by the Supreme Court of Florida, a body whose jurisdiction is limited by that same document.  *See generally* Art. V, § 3, Fla. Const.

In short, this Court concludes Plaintiff does not have a property interest in holding office.   In Florida law, as in federal law, public service is a privilege, not a right.  Therefore, Defendants' motions to dismiss are **GRANTED IN PART** as to this issue.  Count I of the complaint is **DISMISSED** and Count III of the complaint is **DISMISSED IN PART** to the extent it alleges the deprivation of a property right.

## Failure to State a Liberty Interest Claim

Count II of the complaint, and the remaining part of Count III, allege Plaintiff's liberty interests were violated without due process. Defendant Galvano argues Plaintiff has failed to state a claim. This Court agrees.

"[W]here the State attaches 'a badge of infamy' to the citizen, due process comes into play." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971) (quoting *Wieman v. Updegraff*, 344 U.S. 183, 191 (1952)). Such claims are known as "stigma-plus" claims.

> Under this test, a plaintiff claiming a deprivation based on defamation by the government must establish the fact of the defamation "plus" the violation of some more tangible interest before the plaintiff is entitled to invoke the procedural protections of the Due Process Clause. In considering what satisfies the "plus" prong of this analysis, [courts] look[ ] to whether state action ha[s] significantly altered or extinguished a right or status previously recognized by state law.

*Behrens v. Regier*, 422 F.3d 1255, 1260 (11th Cir. 2005) (internal marks and citations omitted). To state a claim for a procedural due process violation under the stigma-plus doctrine, a plaintiff must allege not only that they have been "stigmatized but also stigmatized in connection with a denial of a right or status previously recognized under state law." *Id.* (quoting *Smith v. Siegelman*, 322 F.3d 1290, 1296 (11th Cir. 2003)). The Eleventh Circuit has more fully described the elements of a stigma-plus claim arising out of loss of government employment as "(1) a false statement, (2) of a stigmatizing nature, (3) attending a governmental

26

employee's discharge, (4) [that was] made public, (5) by the governmental employer, (6) without a meaningful opportunity for an employee name clearing hearing." *Cotton v. Jackson*, 216 F.3d 1328, 1330 (11th Cir. 2000) (quoting *Warren v. Crawford*, 927 F.2d 559, 565 (11th Cir. 1991)).[6]

Plaintiff has sufficiently alleged he has been stigmatized in a way that deprives him of a previously recognized right or status under state law.[7]  In this case, no one could seriously contend the label the State of Florida has attached to Plaintiff—that, through incompetence and neglect of duty, he failed to prevent numerous brutal murders and serious injuries—is not stigmatizing; and by operation of law, the official affixing of that label to him deprived him of his office as Sheriff of Broward County, a status he held which was recognized by state law after Plaintiff was duly re-elected to that office in 2016.  ECF No. 1 at 7.  The only remaining question is,

---

[6] This case is not a typical case of the loss of government employment.  As this Court earlier explained, the issue here is not that Plaintiff's employment was terminated, but rather that he was removed from his elected office.  This case is not an employment case with a governmental dimension, it is a governmental case with an employment dimension.  Although this subtle but significant difference will carry great importance in the analysis of whether Plaintiff has stated a claim, this Court does not believe it makes application of the *Cotton* elements inappropriate, at least in their spirit if not their exact wording.  This Court would not conclude, for example, that Plaintiff fails to state a claim because the Florida Senate is not literally his "employer."

[7] Defendant Galvano argues Plaintiff has only pleaded he was stigmatized by the general conclusion that he was incompetent and neglectful of his duty, and has not identified a specific false statement to that effect.  Plaintiff has, however, incorporated into his complaint the executive order of suspension, ECF No. 2-1, and the Florida Senate's Report and Order concluding the evidence supported that executive order and removing Plaintiff from office, ECF No. 90-6.  In the 12(b)(6) context, this Court concludes Plaintiff has pleaded sufficient facts to identify a specific statement that Plaintiff alleges is false and stigmatizing.

based on the well-pleaded facts of the complaint and the information in the attachments, has Plaintiff stated a claim that he was deprived of that status without a meaningful opportunity to be heard and clear his name?

The stigma-plus doctrine is founded on the principle that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Constantineau*, 400 U.S. at 437. It is often far from clear, however, what the precise contours of that notice and opportunity to be heard are in any given case. *See Nash v. Auburn Univ.*, 812 F.2d 655, 660 (11th Cir. 1987) ("What process is due is measured by a flexible standard that depends on the practical requirements of the circumstances."). Under this framework, the issue in this case boils down to two deceptively simple questions. First, what process was due under the circumstances? Second, based on the allegations in the complaint and informed by the attachments to the complaint, did the process Plaintiff claims he received fail to satisfy the requirements of the Due Process Clause? This Court will begin by expositing the legal framework applicable to procedural due process claims. Next, this Court will examine what process Plaintiff claims to have received, supplemented by the attachments to the complaint which control in the event of any conflict. This Court will then analyze whether Plaintiff states a procedural due process claim as to any of those allegations.

## I.  The Due Process Framework

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  *Mathews v. Eldrige*, 424 U.S. 319, 335 (1976).  "The adequacy of the notice and the nature of the hearing vary according to an 'appropriate accommodation of the competing interests involved.' " *Nash*, 812 F.2d at 660 (quoting *Goss v. Lopez*, 419 U.S. 565, 579 (1975)).  Together, the notice and hearing must "provide a meaningful hedge against erroneous action." *Goss*, 419 U.S. at 583.  The notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 13 (1978) (quoting *Mullane v. Cent. Hanover Tr. Co.*, 339 U.S. 306, 314 (1950)).  Analysis of what process is due under a given set of circumstances

> generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.

It is important to again emphasize that the issue in this case concerns the Due Process Clause, and nothing else.  This case is not a question of analyzing whether Plaintiff's suspension and removal procedure conformed to the requirements of

Florida law nor the procedural rules of the Florida Senate.  In the first place, adherence to the procedures provided by state law for an invasion of a protected interest does not establish that the state provided due process.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).  By the same token, the failure to adhere to a process identified in state law is not enough to show the state did not afford due process.  *See Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 610 (1974) ("Due process of law guarantees 'no particular form of procedure; it protects substantial rights.' " (quoting *NLRB v. Mackay Co.*, 304 U.S. 333, 351 (1938))).  Put differently, an individual cannot bootstrap the violation of a state procedural rule into a federal due process claim, and the state cannot absolve itself of the obligation to provide *due* process merely by independently providing *some* process.  When it comes to due process, state law is neither a floor nor a ceiling, neither a sword nor a shield.  This is the foundation this Court must stand upon as it applies the *Mathews* framework.

Precedent can be a useful guide in applying *Mathews*, but the situation giving rise to this case—suspension and removal of an elected official by two branches of government—raises issues which do not ordinarily arise in everyday procedural due process cases.  Cases which do present analogous situations often do not provide significant insight into what sort of procedures the Due Process Clause requires, but instead only hold that a hearing of some sort is required; and some cases do not even go that far.  Those cases are, therefore, of limited utility.  For example, in

*Constantineau*, an individual prevailed on a stigma-plus claim after a city chief of police posted stigmatizing public notices in every liquor-retailing establishment in the city forbidding the sale or gifting of liquor to her, without any notice nor a hearing of any kind.  400 U.S. at 435–37.  Because no process at all was provided, the Court in *Constantineau* did not discuss what process would have been sufficient. In *Behrens*, the appellant brought a stigma-plus claim against Florida's Department of Children and Families, alleging it had "erroneously labeled him as a 'verified' child abuser, and that the presence of this stigmatizing information resulted in his inability to adopt another child."  422 F.3d at 1256.  But the Eleventh Circuit concluded the appellant failed to satisfy the "plus" element of the stigma-plus test, because he could not establish he had a right, under Florida law, to adopt another child, nor any right to have such an adoption application approved.  *Id.* at 1261–62. The Eleventh Circuit did not reach the issue of whether Florida had afforded sufficient process, nor did it discuss what that process would have been under those circumstances.  *Snipes* involved executive suspension and removal of a Florida elected official, but again—as the undersigned explained in that case—the plaintiff had received no hearing at all, and this Court did not address the precise contours of the process to which Snipes was entitled.  2019 WL 163352, at *4–*5.  *Reams* also arose out of the suspension of an elected Florida official, but the plaintiff in that case also had, once again, received no opportunity for a hearing to clear his name.  2018

31

WL 5809967, at *1.  Judge Hinkle held due process required either reinstatement of the suspended official, an opportunity for him to be heard by the governor, or an "appropriate hearing" before the Florida Senate, which Judge Hinkle defined to mean "an evidentiary hearing . . . conducted by the Senate, a Senate committee, or a special master.  Evidence may, at the Senate's election, be taken in writing or through witnesses; the rules of evidence need not apply."  *Id.* at *5.  These cases make clear that some sort of hearing is indeed necessary, but give little guidance as to what form it must take.

Other cases arise out of situations which bear little resemblance to the situation here, save that a person alleges they were deprived of their rights without adequate process.  Nevertheless, what those cases have held the Due Process Clause to require in those circumstances can give insight as to what might be necessary here.

One such clear principle comes from *Goldberg v. Kelly*, 397 U.S. 254 (1970), a case challenging the termination of welfare benefits without the right of cross-examination.  The Supreme Court explained that, "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."  *Id.* at 269.  The present case falls in that category—as this Court explained in its analysis of legislative immunity, the issue of whether to remove Plaintiff from office was primarily a question of fact, and by any measure it was an important one.  Cross-examination of adverse witnesses is

therefore an important element of due process in Florida's suspension and removal procedure, with the scope of its application to be determined by the *Mathews* interest-balancing framework.

*Nash* is also helpful. Although the situation in *Nash* was quite different from the one presented in this case, the procedural claims presented are similar. In *Nash*, the appellants were suspended from their university after they were found to have cheated on an exam. 812 F.2d at 656. The hearing on their academic dishonesty was initially scheduled four days after the accusatory notice was provided, but appellants received a continuance of two additional days. *Id.* at 657–58. They also received a more specific notice of the charge and a list of potential witnesses against them. *Id.* at 658. During the hearing before the student ethics board, the appellants were allowed to question opposing witnesses through the non-voting chancellor of the ethics board, to have the advice (though not the participation) of their attorney, to call their own witnesses, and to present their own statements and defenses. *Id.* at 658. After being found guilty, the appellants made use of two levels of appeals. The first appeal was to the dean of the School of Veterinary Medicine, who received the report and recommendation of a faculty committee that had reviewed the record, questioned the appellants, and received oral and written statements from them. *Id.* at 659. The academic dean accepted the recommendation and upheld the board's decision, at which point the appellants took their final appeal to the dean of the

33

university.  *Id.*  The university dean reviewed the case file and affirmed the suspensions.  *Id.*

The appellants filed a lawsuit in federal court, alleging the procedures afforded them prior to their suspension did not satisfy due process.  *Id.* at 661.  They contended that "receiving the restated notice only one day before the . . . hearing effectively denied them a meaningful opportunity to be heard."  *Id.*  The Eleventh Circuit disagreed, pointing out that the hearing took place six days after the initial notice, that the appellants had been able to secure counsel and witnesses for their defense in that time, and that in any event they had acquiesced to the timing without objection.  *Id.* at 661–62.  The appellants also alleged the notice should have advised them more fully "of the nature of the testimony to be presented against them [and] of the facts underlying the charge of academic dishonesty," and "that they were entitled to a summary of the testimony expected" from the witnesses, including of a statistician who gave expert testimony, "because only such notice would have provided safeguards against their surprise at the testimony and would have ensured them a fair opportunity to respond" by calling their own expert statistician witness.  *Id.* at 662.  The Eleventh Circuit again disagreed, holding the appellants were not entitled to notice or summaries of the testimony against them because they were present throughout the entire hearing and able to confront that testimony.  *Id.* at 662–63.  The Eleventh Circuit also explained cross-examination is important where

credibility of a witness is at issue, but that due process allows other questions of fact, such as those "where the proof is found in facts objectively discerned and not on inference from personal observations," to be disputed through the opportunity to present evidence that, if believed, would contradict or disprove the testimony in question. *Id.* at 664.

Guided by these precedents, this Court must also acknowledge that the elements of the *Mathews* analysis will be influenced by an unusual and weighty consideration unique to this case. Certainly, Plaintiff alleges his reputation has suffered considerable damage as a result of his having been declared incompetent and neglectful of his duty. But this matter does not begin and end with Plaintiff, and more is at stake than the loss of his job and reputation. As this Court explained above, *see supra* note 5, this case does not present a normal loss-of-government-employment stigma-plus claim. Plaintiff was an elected official, but the voters who put Plaintiff into that office did not remove him from it. Rather, it was a different group of elected officials—Defendant DeSantis and the Florida Senate—who removed Plaintiff, using their own judgment to overturn the judgment of the electors of Broward County. In considering the first element of the *Mathews* analysis, therefore, this Court must remain mindful of the fact that the individual interest at stake, the state-law right or status of which Plaintiff was deprived, is connected on a deep level with the foundational functioning of our representative system of

35

government.     The Florida Constitution provides that, under extraordinary circumstances, the will of the voters may be overborne by the judgment of the governor and the Senate; but the application of the *Mathews* analysis will be colored by the fact that Plaintiff was an elected official, and thus the interest in question and the risks inherent in an erroneous deprivation have greater dimension than they do in an ordinary case.  Furthermore, given that the decision in question involves the removal of an elected official by other elected officials, the State's interest in providing meaningful procedure is correspondingly higher than it would be in many other procedural due process cases.

This Court will now examine Plaintiff's allegations as presented in the complaint and attachments thereto and will apply the *Mathews* framework to determine whether Plaintiff states a claim.

## II. Allegations and Application

The process Plaintiff claims he received began with the issuance of Executive Order 19-14, which suspended Plaintiff from office.  ECF No. 2-1 (Executive Order 19-14).  This executive order quoted section 30.07, Florida Statutes, as providing that "sheriffs may appoint deputies to act under them who shall have the same power as the sheriff appointing them, and for the neglect and default of whom in the execution of their office the sheriff shall be responsible."  *Id.* at 1 (quoting § 30.07, Fla. Stat. (2019)).  The executive order went on to describe the operational failings

of several of Plaintiff's deputies, describing each as "acting on behalf of and in place of [Plaintiff]." *Id.* at 2–3. It also faulted certain deputies for abuse of their discretion to engage active shooters and charged that "the responsibility for the exercise of that discretion falls upon the elected sheriff." *Id.* at 3. Finally, it alleged Plaintiff had failed to provide proper training for his deputies, "ha[d] not implemented proper protocols to provide guaranteed access to emergency services, nor proper protocols to have timely, unified command centers setup [sic] to control a crime scene." *Id.* at 5.

After the executive order of suspension issued, but before the Florida Senate made the final decision to remove Plaintiff permanently from office, Plaintiff demanded—and received—a hearing on the allegations in the executive order of suspension, which took place before a Special Master appointed by the Florida Senate. On February 25, 2019, during the proceedings before this Special Master, Defendant DeSantis supplemented the executive order of suspension with a bill of particulars. ECF No. 2-8. This bill of particulars provided much richer detail than the executive order of suspension. Concerning the January 6, 2017, airport shooting, the bill of particulars alleged not that Plaintiff ought to have prevented the shooting itself, but rather that "subsequent failures by [Plaintiff], and the deputies he is responsible for, led to dozens of additional injuries and unwarranted chaos over the next few hours." *Id.* at 3. The bill of particulars discussed the multiple false alarms

issued over law enforcement radio frequencies and referenced the link between these miscommunications and "the loss of control during the event," ultimately assigning the blame to the Broward County Sheriff's Office (BCSO) for "failure to ensure proper incident command procedures." *Id.* at 4–5. The bill of particulars claimed BCSO did not adequately allocate personnel and resources to the airport, and stated "[a]llocation of staff and resources is purely a responsibility that falls onto the elected sheriff." *Id.* at 6. Moving on to the Marjory Stoneman Douglas High School shooting, the bill of particulars incorporated by reference the entirety of the Initial Report of the Marjory Stoneman Douglas High School Public Safety Commission (Initial Report), issued on January 2, 2019. *Id.* Like the executive order of suspension, the bill of particulars repeatedly referenced Plaintiff's responsibility for the acts and omissions of his deputies both in the time leading up to the Marjory Stoneman Douglas High School shooting and the events during and after the shooting. *See, e.g.*, *id.* at 6, 10. The bill of particulars states section 30.07, Florida Statutes, "places responsibility for the actions and negligence of appointed deputies solely onto the elected sheriff," *id.* at 7, identifies numerous failings by BCSO deputies, and assigns ultimate responsibility for those failings to Plaintiff. *See, e.g.*, *id.* (describing the actions of Deputy Scot Peterson and seven other BSCO deputies). It alleges Plaintiff failed to implement proper training in response to active assailants for BCSO deputies. *Id.* at 9.

38

The bill of particulars then goes on to identify numerous "specific charges." *Id.* at 11. These allege Plaintiff "neglected his duty and/or was incompetent in" (1) failing to conserve the peace in Broward County, required by section 30.15, Florida Statutes; (2) the "negligence of the deputies he appointed" who responded to the Marjory Stoneman Douglas High School shooting, referencing section 30.07, Florida Statutes; (3) failure to protect the lives of the five victims of the airport shooting; (4) failing to protect the victims injured in the airport shooting due to the "chaos and confusion" which followed it, causing further "avoidable" injuries; (5) failing to provide appropriate staffing at the airport; (6) failing to provide appropriate training for an active shooter situation at the Fort Lauderdale airport; (7) failing to provide sufficient policies "for establishing incident command to provide effective response and communication during mass casualty/active shooter situations;" (8) failing to protect the lives of the Marjory Stoneman Douglas High School shooting victims; (9) failing to require his deputies to engage the shooter in that incident; (10) failing to provide appropriate active shooter training to deputies and thus failing to be a conservator of the peace; (11) giving discretion to his deputies not to engage an active shooter; (12) failing to properly develop "frequent training requirements" for deputies; (13) failing to adequately staff the BCSO Airport District with competent deputies; and (14) failing to staff the School Resource Officer program with competent deputies. *Id.* at 10–14.

39

The Special Master provided the parties with an opportunity to engage in a prehearing and discovery process akin to that found in most civil lawsuits. The Special Master's process allowed Plaintiff the ability (and the time) to gather and introduce voluminous evidence, *see* ECF Nos. 61–82; subpoena witnesses, take several depositions and introduce them into the record, *see* ECF Nos. 2-25 (letter from Special Master re: subpoenas), 83-1–83-8 (deposition transcripts); have prehearing conferences and exchange witness and exhibit lists, *see generally* ECF Nos. 2 & 4; *see also* ECF No. 7-4 (Plaintiff's updated exhibit list); submit prehearing bench memoranda on a variety of subjects, ECF Nos. 4-1, 4-2, 4-8, 7-2, & 7-3; have counsel appear, question witnesses, and present argument to the Special Master, *see generally* ECF Nos. 84-1, 84-2, 85-1, & 85-2 (transcripts of final hearing before Special Master); present the testimony of live witnesses during the hearing, ECF No. 1 at 10; and to cross-examine any opposing witnesses, *see, e.g.*, ECF No. 84-2 at 217 (cross-examination of Plaintiff's witness Dale by Defendant DeSantis's counsel).[8]

After the hearing, the parties submitted proposed recommended orders to the Special Master, ECF Nos. 86-2 & 86-3, with Plaintiff submitting his proposed recommended order eight days after Defendant DeSantis submitted his own. The

---

[8] *See also* ECF No. 90-2 at 58 (Special Master, in response to a question from the Rules Committee, stating "either of the parties could call as many witnesses as they wanted to call, and I didn't have any kind of a benchmark for, you know, who they could call or who they couldn't call").

Special Master then submitted a detailed Report and Recommendation to the Florida Senate, concluding enough evidence existed to support a *prima facie* case for suspension but recommending Plaintiff be reinstated.  ECF No. 86-4.

The Rules Committee of the Florida Senate then scheduled a public meeting for presentation of the Report and Recommendation, "comment" from counsel for both Plaintiff and Defendant DeSantis who were each allotted twenty minutes to speak in addition to time to answer questions, and public testimony.  ECF No. 86-5; *see also* ECF No. 86-9 (letter from Rules Committee Chair to counsel for the parties).[9]  Ten days before the Rules Committee meeting, and in response to an inquiry from Plaintiff's counsel, the Special Counsel to the Florida Senate informed the parties there was "no statute or rule prohibiting the parties, or any other person, from discussing the merits of any suspension case with an individual Senator" and also inviting the parties to submit any "new information" they possessed for consideration by the Rules Committee.  ECF No. 86-10.  Four days later—and thus six days before the hearing—Defendant DeSantis then submitted the affidavit of Danielle Terrell, Executive Director of the Commission for Florida Law Enforcement Accreditation, together with several attached investigative reports and

---

[9] As it turned out, Plaintiff and Defendant DeSantis each received twenty-five minutes to present their cases, because Defendant DeSantis's presentation ran over and the Rules Committee granted Plaintiff extra time to ensure both parties received equal time.  ECF No. 90-2 at 226.

other documents, the whole of which totaled approximately six hundred pages.  ECF

Nos. 87–89.[10]   Plaintiff objected, arguing that the presentation of new evidence

violated the Florida Senate's previously established procedure and denied Plaintiff

any meaningful opportunity to investigate or confront the new information.  ECF

No. 86-13.[11]   On October 14, 2019, the Special Counsel informed the parties the

Florida Senate had "become aware, and is in possession, of information" related to

Plaintiff's suspension and potential removal "through documentation related to the

Marjory Stoneman Douglas Commission [sic] High School Public Safety

Commission."  ECF No. 86-11.  It turned out the documentation in question was a

report from the Florida Department of Law Enforcement, Office of Executive

---

[10] During the Rules Committee meeting, counsel for Defendant DeSantis clarified that Defendant DeSantis submitted this affidavit to refute a contention in Plaintiff's proposed order to the Special Master that the Broward County Sheriff's Office lost its accreditation only after Plaintiff's suspension and once Plaintiff's successor had been appointed, and thus the accreditation issue did not involve Plaintiff's tenure in office.  ECF No. 90-2 at 148–49.  Defendant DeSantis's counsel explained that the loss of accreditation occurred after the Special Master hearing, and "we looked at it and we thought it was better to have a more full record, since there were representations about that accreditation and the cause for that deaccreditation."  *Id.* at 149.  Rather than new evidence being deliberately withheld and then submitted after the time to respond had passed, therefore, the attachments to the complaint show this was newly discovered evidence not previously available.  The attachments therefore reflect that Plaintiff not only had the opportunity to respond to it before the Rules Committee, but that Defendant DeSantis only submitted it in the first place as a response to argument Plaintiff presented.

[11] Plaintiff's objection letter to the Special Counsel refers to an "October 17, 2019, letter outlining that the parties may present additional evidence to the Florida Senate not previously considered by the Special Master."  ECF No. 86-13 at 2.  No October 17, 2019, letter is attached to Plaintiff's complaint.  The only letter from the Special Counsel informing the parties they may submit additional information is the October 11, 2019, letter to that effect, which was sent to the parties via email rather than physical post.  ECF No. 86-10.

Investigations, which—though not submitted to the Florida Senate by the parties[12]—was publicly available.  ECF No. 86-12 (memorandum to Senators from Defendant Galvano).   On October 18, 2019, Defendant DeSantis submitted an additional memorandum to the Rules Committee, arguing among other things that "[b]ecause of their expansive powers, Sheriffs are directly responsible for the actions of their deputies."  ECF No. 90-1 at 4 (emphasis removed).

Next came the public meeting of the Rules Committee.  The main body of the complaint alleges the

> Rules Committee considered additional highly objectionable material including (1) references to out-of-state decisions concerning the duties and responsibilities of sheriffs under circumstances and procedures not applicable to Florida suspension[s] and removals, (2) consideration of an "alter-ego" doctrine that was never advanced by the Governor . . . (3) holding Sheriff Israel responsible for the failures of the Broward County emergency radio system despite the Governor having withdrawn that allegation from the suspension decision, (4) consideration of a purported no[-]confidence vote of the Broward Sheriff's Office police union that was never made a part of the Special Master proceedings or included within the Governor's bill of particulars, (5) separate and undisclosed "research" by members of the Florida Senate, (6) personal (and factually incorrect) assertions and arguments made by members of the public whose information was not noticed to Sheriff Israel who had no opportunity to adduce corrective or countervailing information, and (6) [sic] unknown but admitted *ex parte* communications by the Governor's Office with individual Senators that were never disclosed to Sheriff Israel and the content thereof was never made a part of the public record.

---

[12] Plaintiff's complaint includes lengthy quotations from the Florida Statutes, including a provision stating, "[n]othing herein shall prevent the Senate or its select committee from making its own investigation and presenting such evidence as its investigation may reveal."  ECF No. 1 at 17 (quoting § 112.43, Fla. Stat. (2019)).

*Id.* at 14–15.

The attachments to the complaint provide additional detail.  This Court will focus on those portions relevant to the supposed procedural failings Plaintiff identifies.

<u>Non-Florida Cases and "Alter Ego"</u>

Plaintiff's first two points are intertwined with one another.  During questioning of the Special Master and the parties' attorneys, members of the Rules Committee discussed the legal status of Florida's sheriffs *vis-à-vis* their deputies, and referenced both decisions of Florida courts and decisions from states other than Florida.[13]  The launching point for these discussions was the question of how section 30.07, Florida Statutes, affects the "unique and special relationship between a sheriff

---

[13] During his questioning of the Special Master, Senator Bradley stated that, "[i]n looking at case law, I see that there literally are statements in our Florida laws that say 'The sheriff and his deputy are one in [sic] the same.  A deputy is the sheriff's alter ego and has all of the sheriff's sovereign powers.' "  ECF No. 90-2 at 42.  Senator Bradley did not identify the cases, but this statement appears to be a combination of language quoted from two cases. *See Mendez v. Blackburn*, 226 So. 2d 340, 344 (Fla. 1969)  ("It is generally held that the Sheriff and his deputy are one and the same person and that the acts of the deputy may be imputed to the Sheriff." (quoting *Holland v. Mayes*, 19 So. 2d 709, 710 (Fla. 1944) *receded from in part on other grounds*, *Mendez*, 226 So. 2d at 344)); *Tanner v. McCall*, 625 F.2d 1183, 1186 (5th Cir. 1980) (interpreting section 30.07, Florida Statutes, to mean "[a] deputy is the sheriff's alter ego and has all the sheriff's sovereign powers, except the power to appoint other deputies.  A deputy's actions are those of the sheriff and the sheriff is civilly liable for those actions[.]" (citing  *Blackburn v. Brorein*, 70 So. 2d 293, 298 (Fla. 1954)).  Of course, at the time *Tanner* was decided, the modern Eleventh Circuit was part of the Fifth Circuit, so *Tanner* binds this Court. *See Bonner v. City of Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (holding all decisions of the Fifth Circuit issued before the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit).

and his deputies." ECF No. 90-2 at 42.  In response to questions, the Special Master explained he interpreted section 30.07 as relating only to tort liability, not for purposes of executive suspension and removal.  *Id.* at 42–43.  A Senator clarified that section 30.07 was drafted in 1868 and amended only once, in 1927, a time when "there [were] only eighty-five people living in Miami, Palm Beach, and Broward County at the time, and so I think that speaks a little bit of the how, what, where, when, and why of that statute."  *Id.* at 66.

During his presentation, Defendant DeSantis's counsel argued "the law makes [Plaintiff] responsible for the acts of his deputies."  *Id.* at 121.  "Sheriffs," he explained, "are different" from other elected officials.  *Id.* at 123.  Not only do they have sweeping powers "to take your liberty, to take your property, and in some circumstances use force, even deadly force, and take your life," but section 30.07 means a sheriff "can delegate all that power to his deputies."  *Id.* at 124.[14]  Defendant DeSantis's counsel discussed Florida case law and "longstanding common law" on the subject, which was also referenced in some of the cases he discussed.  *Id.* at 124–

---

[14] Defendant DeSantis's October 18, 2019, memorandum to the Rules Committee did not cite any cases from states other than Florida.  *See generally* ECF No. 90-1.  Defendant DeSantis's proposed recommended order submitted to the Special Master cites *United States v. Markland*, 635 F.2d 174 (2d Cir. 1980), as relevant to the meaning of "conservator of the peace," but cites no other cases from outside Florida.  ECF No. 86-2 at 50.  Plaintiff's proposed recommended order also avoided citing non-Floridian cases, though it did reference five "[r]ecent mass shooting events" which Plaintiff argued "underscore[ ] that law enforcement must be ready for the unexpected," four of which occurred outside Florida and three of which postdated the shootings forming the basis for Plaintiff's suspension and removal.  ECF No. 86-3 at 28.

26; *see also Mendez*, 226 So. 2d at 342 (citing *Swenson v. Cahoon*, 152 So. 203 (Fla. 1933)).  In response to a question, Defendant DeSantis's counsel argued section 30.07 applied to situations beyond questions of tort liability and referenced the concurring opinion of Justice Muñiz in *Israel*, 269 So. 3d at 497, in which three other Justices joined, as supporting that position.  ECF No. 90-2 at 139–40.  The questioning Senator then followed up by expressing skepticism of the idea that section 30.07 applied only to questions of tort liability and referenced

> the research [of] which I am aware, [from] numerous other states, determining that this does apply to matters other than tort liability, and that they have held in Wisconsin . . . a sheriff in contempt for the actions of his deputies, they have removed a sheriff from office pursuant to a statute constitutional provision [sic] dealing with neglect of office, and in so doing have applied the same standard as [s]ection 30.07 in the common law . . ..

*Id.* at 141.[15]  Later, a different Senator asked Defendant DeSantis's counsel whether there was a Florida case other than *Mendez* bearing on whether section 30.07 applied in the context of a removal proceeding, and specifically referenced the aforementioned Wisconsin cases.  *Id.* at 211.  "The case that you're talking about

---

[15] The record is ambiguous, but it appears this Senator referred to several Wisconsin cases, each of which dealt with a different situation involving sheriffs, rather than a single case dealing with one very troubled sheriff.  *See, e.g.*, *State v. Parisi*, 321 N.W.2d 366, 366 (Wisc. Ct. App. 1982) ("A deputy has been said to be the vice-principal or alter ego of the sheriff and not his agent, servant or employee." (citing *State ex rel. Cain v. Corbett*, 69 S.E.2d 20 (N.C. 1952)); *State ex rel. Mann v. Brophy*, 38 Wis. 413, 424 (Wis. 1875) (holding a state sheriff could be subject to criminal contempt proceedings "for a willful neglect of duty" such as failure to execute a court-ordered levy).  Later in the meeting, the same Senator referenced *Brophy*.  ECF No. 90-2 at 254.

doesn't really exist in Florida," Defendant DeSantis's counsel responded, "because courts do not review the work of the Senate.  [. . .]  So that case won't be out there, to my knowledge.  I can't point to a case, because that's not a case that they would normally take up."  *Id.* at 211–12.

Senators also asked Plaintiff's counsel about these subjects.  One line of questioning began with a Senator asking Plaintiff's counsel whether section 30.07 extended to subjects other than tort liability, to which Plaintiff's counsel responded "the individual actions of deputy sheriffs cannot be . . . attributable to . . . the sheriff for purposes of constitutional suspension and revocation based on incompetence or neglect of duty."  *Id.* at 253.  "And how," the Senator then asked, "do you square the lack of any kind of limitation [in the statute] as to that?"  *Id.* at 254.  The Senator then referred to cases from Wisconsin, Alabama, and Ohio which imposed various sanctions on sheriffs for the actions of their deputies.  *Id.*[16]  The Senator concluded, "how do you limit [section 30.07] to tort liability when these other jurisdictions do not, nor does the face of the statute limit it to tort liability?"  *Id.* at 256.  Plaintiff's counsel responded, in pertinent part, that the out-of-state cases were distinguishable because they involved law enforcement standards, policies, and practices; and because they involved procedures unlike Florida's suspension and removal process.

---

[16] In addition to *Brophy*, cited in note 13 *supra*, the Senator referred in this question to *Heintz v. Hamann*, 10 Ohio N.P. (n.s.) 569 (Ct. Com. Pl. of Ohio, Hamilton Cty. Jan. 1911), and appears—although the record is unclear—to refer to *Wright v. Bailey*, 611 So. 2d 300 (Ala. 1992).

*Id.* at 257–58; *see also id.* at 327 (Plaintiff's counsel, arguing "[t]he authority with regard to the sheriff's operation of the sheriff's office, is not that of a shadow or an alter ego function"). The Senator asked whether Plaintiff's counsel agreed with *Heintz* that public office is a public trust, and that Plaintiff "had a public trust, and that imposed upon him a unique responsibility, given his position as a sheriff." *Id.* at 260. Plaintiff's counsel did not directly answer the question, saying instead that Plaintiff "embraces the constitutional obligation vested in him." *Id.* at 261. Later, a Senator asked whether Defendant DeSantis had referenced section 30.07 as part of the basis for suspending Plaintiff. *Id.* at 292–93. Plaintiff's counsel responded,

> Let me be very clear, your recollection is one hundred percent right. 30.07 shows up in the executive order. It shows up throughout this. That statute, as a duty[,] an obligation, *was made a part of the case. I recognize that. We confronted it.* This issue of alter ego or, some case[s] would call it, derivative liability was not the subject of litigation. What was the subject, and I don't mean to parse, sir, what was the subject is *whether Scot Peterson's acts are the acts of [Plaintiff].* And that was litigated on the criminal charge against Scot Peterson.

*Id.* at 293 (emphasis added).

During the portion of the meeting set aside for public commentary, a member of the public spoke briefly about section 30.07, and also explaining section 30.071 had been amended in 1994 to limit section 30.07. *Id.* at 352. Another member of the public—an attorney representing the families of three students killed in the Marjory Stoneman Douglas shooting—took the floor to argue that section 30.07 was intended to apply beyond mere civil liability for deputies' actions because, when it

48

was passed, Florida had not waived its sovereign immunity in civil actions, and so no such liability would have existed at the time. *Id.* at 376–77. A third opined that "to say [Plaintiff] is responsible for every employees' [sic] failure to act is unrealistic and unreasonable." *Id.* at 381. During the floor debate, Senators referenced the "alter ego" interpretation of section 30.07, *id.* at 427, 456–57; and the argument that a sheriff's position is different from other public offices, *id.* at 436–37; but none discussed or referenced case law from states other than Florida.

This Court fails to see how it would be improper for the Florida Senate to consider cases from other jurisdictions in this way, under any application of *Mathews*. This Court is aware of no principle of law which makes consideration of persuasive authority a violation of due process. Courts regularly consider cases from different jurisdictions when relevant and helpful to their analyses. *See, e.g.*, *Farley v. Collins*, 146 So. 2d 366, 368 (Fla. 1962) (interpreting a Florida statute which was based on a New York statute, and explaining that "[t]o the extent . . . the Florida statute and the New York statute are in harmony, we would look to the New York decisions as a guide to our own conclusion"); *but see Palladino Holding Corp. v. Broward Cty.*, 504 So. 2d 465, 468 (Fla. 4th DCA 1987) ("Case law of other states is of dubious precedential value when statutory provisions are involved that are significantly different from Florida's."). Forbidding the Florida Senate from looking to caselaw from other states for guidance in uncharted territory would also increase

49

the likelihood of an erroneous determination, particularly due to the dearth of appellate remedies.  For the opposite to be true, this Court would have to credit the idea that the Florida Senate would somehow fail to account for the fact that cases from outside Florida are not applying Florida law—an absurd suggestion to make about one chamber of a state's lawmaking body. Taking the allegations in the complaint and the attachments thereto in the light most favorable to Plaintiff, this Court must conclude Plaintiff has failed to state a claim with respect to the consideration of out-of-state caselaw because doing so is permissible under any theory of due process.  The matter might be different if the complaint alleged the Rules Committee—or the Florida Senate more broadly—ignored Florida law and arbitrarily followed contradictory caselaw from another jurisdiction; but Plaintiff does not so allege, and even if he did the attachments would belie that allegation. Under any theory of due process, Plaintiff has failed to state a claim as to the consideration of cases from other jurisdictions.

As to Plaintiff's allegation that the "alter ego" theory was never presented to the Special Master, this is clearly contradicted by the attachments to the complaint and this Court is forced to conclude Plaintiff fails to state a claim as to this item. *Cf. Friedman*, 520 F.3d at 1295 n.6 (explaining that, in the event of such conflict, the attachments to the complaint control).  Assuming, without deciding, that arguing a theory before the Rules Committee without first presenting it to the Special Master

50

would violate due process, the attachments to the complaint reflect that Defendant DeSantis advanced the "alter ego" interpretation of section 30.07 from the very beginning of the process.   Executive Order 19-14 cites section 30.07, refers repeatedly to deputies "acting on behalf of and in place of [Plaintiff]," and specifies that, although sheriff's deputies have tactical discretion, "the responsibility for the exercise of that discretion falls upon the elected sheriff."   ECF No. 2-1 at 2–4.   The bill of particulars likewise alleges Plaintiff is responsible for his deputies' acts and omissions as if they were his own, based on section 30.07.   ECF No. 2-8 at 6, 8, 10, 11–13.   Defendant DeSantis also argued this theory of Plaintiff's responsibility before the Special Master, who rejected it as "impractical."   ECF No. 86-4 at 24; *see also* ECF No. 86-2 at 50 (Defendant DeSantis's proposed recommended order, arguing that, because of their sweeping constitutional and statutory powers, sheriffs may appoint deputies and are "explicitly responsible" for their deputies' "neglect in office").   Contrary to Plaintiff's characterization, Defendant DeSantis's supplemental memorandum to the Rules Committee, ECF No. 90-1, did not raise any new arguments.[17]   Taking the contents of that memorandum in the light most favorable to Plaintiff, it merely added additional detail and authority to arguments

---

[17] Moreover, the attachments to the complaint reflect that this memorandum was never distributed to the Senators.  *See* ECF No. 90-2 at 148 (Defendant DeSantis's counsel, saying it was his understanding it had not been distributed); ECF No. 90-4 at 92 (Senator, commenting during full Florida Senate debate, that "there was this memorandum of law that, as I understand it, has never been distributed and no one has seen").

that had already been advanced. The closest analogy would be a motion for reconsideration of that nonfinal ruling.[18] Following the Special Master's ruling that section 30.07 did not hold Plaintiff liable for the actions of his deputies, Defendant DeSantis submitted a brief to the Rules Committee citing Florida case law showing section 30.07 does precisely that. The words "alter ego" may not have been used in filings prior to that point, but the substance of the argument remained the same. Defendant DeSantis also offered more detail on the supporting rationale that section 30.07 should be interpreted in this way due to the sheriff's unique and sweeping powers, first alluded to in Defendant DeSantis's proposed recommended order to the Special Master and expanded upon before the Rules Committee—a proceeding in which Plaintiff not only had an opportunity to respond to the argument, but did in fact respond to it. And Plaintiff's counsel admitted to the Rules Committee that he had confronted and litigated the issue of whether Deputy Peterson's actions were Plaintiff's actions, and the meaning of section 30.07. ECF No. 90-2 at 293. In summary, the attachments to the complaint establish beyond question that the "alter ego" argument, however denominated, was not a "new" argument raised for the first

---

[18] In federal court, a motion for reconsideration is proper at any time before final judgment is entered, and in that posture a court may revise its prior orders to correct clear errors of law or fact. Fed. R. Civ. P. 54(b); *Bryan v. Murphy*, 246 F. Supp. 2d 1256, 1258 (N.D. Ga. 2003). This Court is aware of no suggestion that allowing for such revision violates due process—rather, correcting manifest error would seem to be an essential element of due process.

time before the Rules Committee, and Plaintiff therefore cannot state a claim for a due process violation with respect to this issue.

In short, the attachments to the complaint bear out Plaintiff's allegation that the Florida Senate considered case law from other states; but the law establishes beyond any question that this does not offend due process to the extent Plaintiff alleges it was done. Furthermore, the attachments conclusively contradict Plaintiff's allegation that the Florida Senate considered an "alter ego" argument not raised before the Special Master. The attachments show that, to the contrary, this argument was present from the beginning of the suspension and removal proceedings. Accordingly, this Court must conclude Plaintiff fails to state a claim as to either of these issues.

<u>Emergency Radio System</u>

Plaintiff next alleges the Rules Committee "considered . . . holding [Plaintiff] responsible for the failures of the Broward County emergency radio system despite [Defendant DeSantis] having withdrawn that allegation from the suspension decision." ECF No. 1 at 14–15.

Executive Order 19-14 does not single out the Broward County emergency radio system as a specific basis for Plaintiff's suspension. *See generally* ECF No. 2-1. The executive order of suspension did, however, incorporate the whole of the Initial Report and alleged that the criticisms of Plaintiff and BCSO contained therein

53

constituted further incidents of Plaintiff's incompetence and neglect of duty. *Id.* at 6–7; *see* ECF Nos. 14-1, 15-1, & 16-1 (Initial Report).[19]  Relevant here is the final portion of Chapter 7 of the Initial Report, which catalogues in great detail the technical issues law enforcement agencies experienced with their radio communications when responding to the Marjory Stoneman Douglas High School shooting and recommends statewide changes to address the issues that arose.  ECF No. 15-1 at 217–21.  It describes BCSO's inability to patch into the Coral Springs Police Department (CSPD) radio communications (a responsibility assigned to BCSO by county protocol) and the difficulty BCSO deputies had transmitting within their own radio network due to "throttling" issues,[20] "all of which resulted in the use of hand signals, yelling, and confusion" at the school.  *Id.* at 217.  "In sum," the Initial Report states, "the [BCSO] radio system is old, its demand exceeds it[s] capacity, and it crashes when too many users are on the system."  *Id.* at 219.  The

---

[19] The Initial Report is an approximately 360-page document.  Plaintiff submitted it to this Court via its inclusion in Defendant DeSantis's collected exhibits entered during the hearing before the Special Master, resulting in the Initial Report being spread across three separate docket entries, ECF Nos. 14-1, 15-1, & 16-1, for which no table of contents was provided other than Defendant DeSantis's annotated exhibit list, ECF No. 4-3, itself a separate entry submitted more than a month before the docket entries containing the exhibits themselves.  Thus, one document, not of extraordinary length standing alone, can only be read in its entirety by examining three separate docket entries which are part of a larger series of six docket entries, all of which are incorporated by reference into a different docket entry (that is, the executive order of suspension, ECF No. 2-1), which is itself incorporated by reference into the complaint.

[20] As the Initial Report explains, "[t]hrottling prevents radio transmissions and occurs to prevent the radio system from crashing due to its capacity being exceeded.  [. . .]  Throttling creates a communications paralysis . . . [and] a delay in communication between responding deputies."  ECF No. 15-1 at 219.

Initial Report found the radio issues BCSO experienced during its response to the shooting "hampered the response and caused officer safety issues" and "hampered effective command and control," and that although alternative channels were available "there was inadequate common knowledge that the channels existed, and personnel were not trained in how to easily access the channels." *Id.* at 220. Moreover, the Initial Report found "[t]he same radio problems also happened during [BCSO]'s response to the Ft. Lauderdale Airport shooting in January 2017." *Id.* at 221.

Plaintiff argued to the Rules Committee that the allegation concerning the emergency radio system "was withdrawn prior to the trial" before the Special Master on the basis of deposition testimony from former Florida Senator Steven A. Geller, who had become a Broward County Commissioner at the time of the Special Master hearing. ECF No. 90-2 at 291. This deposition settled the matter so conclusively in Plaintiff's favor, Plaintiff argued, that Defendant DeSantis admitted defeat and withdrew the allegation. *Id.* at 242, 285. The Special Master's Report and Recommendation does not address allegations relating to the emergency radio system. *See generally* ECF No. 86-4. The Special Master did, however, discuss it with Senators during the Rules Committee meeting. Given that the emergency radio system was part of the executive order of suspension (via incorporation of the Initial Report) but then seemed to vanish without explanation from the Special Master's

Report and Recommendation, it is unsurprising that several Senators inquired about it.  Early in the Special Master's questioning, a Senator referenced the Initial Report and asked "who would bear responsibility with respect to a radio system that is acknowledged to be tragically and totally flawed?"  ECF No. 90-2 at 19.  The Special Master answered that the report was very long, and that it criticized other entities in relation to the radio system in addition to BCSO.  *Id.* at 20.  The Senator then asked whether the Special Master thought "it was appropriate for [Plaintiff] to blame the [sic] Broward County, and also the Broward County administrator [sic] for this failure" when he had "a full, at least, year's worth of knowledge as to the total breakdown in the communication system" following the airport shooting.  *Id.*  The Special Master said he disagreed with Plaintiff, but clarified that "there were a lot of people or institutions to blame" and that he was not "supportive of . . . the blame game on that issue."  *Id.* at 21.  Referring to Plaintiff's assignment of fault to numerous other entities, the Special Master said, "that's what he articulated in his brief, but I did not concur in any of that, and therefore it was not included in my report."  *Id.* at 22.  Asked about whether Plaintiff should be held responsible for the failings of BCSO because he was the Sheriff, the Special Master opined the failures in question were institutional ones, and continued:

> Particularly, the radio system.  Yes, I'm sure that that was [Plaintiff's] responsibility.  It was likely delegated to someone, but ultimately it was his responsibility, but the [Initial Report] is clear in pointing out, I believe, that the radio system was a system-wide failure, not

> attributable solely to any component or, in this case, [Plaintiff], the
> Broward Sheriff's Office.

*Id.* at 24.  The Special Master explained the BCSO—and therefore, Plaintiff—were in part responsible for the radio system and the failure to follow up on the lessons of the airport shooting, but also that Defendant DeSantis had failed to establish "who was most responsible and where should that finger be pointed most directly."  *Id.* at 26; *see also id.* at 33 (Special Master, clarifying that he did not "recall specific reference to funding of the radio system"); *id.* at 68 (as to whether it was BCSO's responsibility to maintain the radio system, Special Master responding "I would suggest that any agency that serves the people, that finds a component deficient, should report that and should follow up on that" but clarifying BCSO was only one such agency).[21]  The Special Master explained the radio system "is a Broward County Commission function and if it wasn't funded, [BCSO] couldn't purchase it." *Id.* at 69.  Another Senator had previously served on a different committee which had been "presented with a lot of information last year . . . about widespread failures

---

[21] The Special Master also notes that, had Defendant DeSantis "done that, had that been presented to me, I may have had—there may have been a different outcome of my recommendation, but it was not presented to me in the way that your question frames."  ECF No. 90-2 at 26–27.  It is noteworthy that the Special Master does not mention *even once* that Defendant DeSantis waived or withdrew the issue, and instead only presents his *ore tenus* recommendation that the evidence did not, in his view, support the conclusion that Plaintiff was solely responsible for the problems with the radio system.  Despite the withdrawal of the allegation, the Special Master was apparently familiar enough with the underlying facts that he was comfortable making a recommendation to the Rules Committee about it—and moreover, a recommendation that was favorable to Plaintiff.

of the radio system throughout law enforcement in our state" as well as "confusion with 911 routing," and asked the Special Master for context about the way radio systems throughout the state were operating. *Id.* at 95. The Special Master answered that, although it was not included in his report, he had "concluded personally . . . that the radio systems in Broward County contributed in a significant way to each one of these two tragedies or certainly the aftermath." *Id.* at 96. He went on to specify once again, however, that "it was a systemic failure" and BCSO was only one of the multiple decisionmakers involved. *Id.* at 98.

Having asked the Special Master about the radio system, the members of the Rules Committee proceeded to seek responses and clarification from the parties as well. Defendant DeSantis's presentation focused on the alter ego doctrine and "command and control failures" and did not reference the radio system. *Id.* at 115–38. During questioning, one Senator asked whether "the existing record," including information "relating to the matters that you have just presented to us, such as the communication system and other things similar to that" such as deputies being unable to remember the training they had received, "support[s] the kind of institutional failure that must be the failure of the sheriff himself?" *Id.* at 141–42. Defendant DeSantis's counsel answered in the affirmative. *Id.* at 142. Another Senator questioned Defendant DeSantis's counsel about the practical effect of "radio difficulties" during the Marjory Stoneman Douglas shooting, and counsel responded

that, although BCSO "had the throttling issues that they had experienced problems in the past with," he did not recall "any indications" that BCSO had such problems in the time when the shooting was actually occurring, only during the response phase afterwards, "and certainly for the deputies that were stationed outside and never went in, they wouldn't have had those radio problems." *Id.* at 193. Given that the focus of Defendant DeSantis's argument was on Plaintiff's alter ego responsibility for those deputies' failure to engage the shooter, this is tantamount to an admission that any issue with the radio system had nothing to do with that particular ground for Plaintiff's removal.

In his presentation, Plaintiff's counsel went out of his way to confront the discussion about the radio system.

> Let me be very clear, the governor on the record, through his lawyer, said to the special master, we withdraw any allegation that the communication system failures or not failures, have anything to do with this case. We were not given the opportunity to confront that because the governor said, that's not part of the case. That's not something the governor proved, and that's only a review by this Senate as to what the governor attempted to prove. And by the way, the evidence is one hundred percent clear, the reason they withdrew that, Senator Geller testified all about the communication system and the years[-]long process and the efforts by the Broward Sheriff's Office to bring about an effective communication system.

*Id.* at 240–41. He then gave an overview of the evidence showing BCSO had tried to create "workarounds recognizing the existing technology deficiency." *Id.* At another point, he explained that "the radio communication issue" prevented BCSO

59

deputies from learning information contained in 911 calls during the Marjory Stoneman Douglas High School shooting. *Id.* at 271. Later, a Senator asked if Plaintiff's counsel could tell him "the process by which the communication system was funded for the Broward Sheriff's Office," specifically "is that a county function or—how does that system work in terms of the sheriff receiving funding, if you will, for the communications system?" *Id.* at 283–84. Plaintiff's counsel responded at length,[22] explaining again that former Sen. Geller had "testified extensively in deposition about this . . . and there was other testimony corroborating this," and that Defendant DeSantis had withdrawn the allegation due to the strength of that testimony. *Id.* at 284; *see also id.* at 291–92 (Plaintiff's counsel, explaining this for the third time). Plaintiff's counsel explained BCSO merely used the system but had "no authority whatsoever" to make changes to it, nor to create its own independent system, and that "for several years" all the relevant agencies—including BCSO— had been working on the "multi-hundreds of millions of dollar[s] project" to upgrade the emergency radio system. *Id.* at 284–85. Plaintiff, he said, "was constantly banging at the door, sitting at the table, we've got to do something and did a workaround" and that these workarounds represented Plaintiff having "learned from the problems" of the past. *Id.* at 285–86. Still later, another Senator inquired

---

[22] In fact, following Plaintiff's counsel's answer, the Chair of the Rules Committee editorialized, "Thank you, Mr. Kuehne. If that qualifies as brief, I'm not sure what long looks like." ECF No. 90-2 at 286.

whether a request had been made since the Marjory Stoneman Douglas High School shooting for additional funding related to the radio system.  *Id.* at 330.  Plaintiff's counsel responded that, until he was suspended, Plaintiff "was part of that process . . . for discussing with the county moving the county, along with where the new radio tower was going to get built and what was needed to effectively communicate across Broward County."  *Id.* at 331–32.

During the debate portion of the Rules Committee meeting, the radio system was mentioned just once.  As she was describing the vast quantity of details she had been listening to and sorting through during the meeting, one Senator said

> and so I'm sitting here all day like, well, this is one, and there is eight here, and there is four here, and actually this is the time, and this radio system—at the end of the day, we talked a lot about how you can come to the decision that you come to today, and it's not lost on me that Luke's birthday is on Friday . . ..

ECF No. 90-2 at 458–59.  She then focused her discussion on holding Plaintiff "accountable" for former deputy Peterson's failure to intervene in the Marjory Stoneman Douglas shooting.  *Id.* at 59.  During public testimony, a member of the public explained in detail why any issues with the radio system were not Plaintiff's fault. *Id.* at 350–51.

The radio system came in for considerably greater mention during the debate of the full Florida Senate.  One Senator, who voted to remove Plaintiff, said "[e]quipment matters.  The deputies had to work with radios that were constantly

throttling since they were outdated and not able to handle the immense radio traffic. And this was buttressed by the Fort Lauderdale Airport shooting but the issues were never fixed."  ECF No. 90-4 at 53.  Another Senator spoke at greater length and linked the problems with the radio system to the failure of BCSO deputies to run into the high school, attributing that to their lack of information about the situation. *Id.* at 77–78.  She then explained that, in her view, Plaintiff was

> not directly responsible for that circumstance.  Not to say somebody isn't.  But funding issues are important, particularly when it comes to communication.  There is advanced technology that can be used also to help deputies and officers get to a scene sooner, as well as directly pinpoint where fire shots are coming from.  They didn't have that.

*Id.* at 78.  This Senator then questioned the logic of holding Plaintiff accountable for a failure that involved several different agencies and institutions, and whether Plaintiff could be blamed for a problem he did not have the equipment necessary to solve.  *Id.* at 79–81.  The final mention of the radio system during the Senate's debate was from a Senator who held up not the problem of the radio system itself, but of Plaintiff's response to the allegations about that problem as an example of what in his view was Plaintiff's failure to accept responsibility for institutional problems. *Id.* at 144–45.

In summary, the attachments substantiate Plaintiff's allegation that the Florida Senate considered allegations about Broward County's emergency radio system which Defendant DeSantis had abandoned.  The attachments do, however, illustrate

that both Plaintiff and the Special Master had—and took—the opportunity to argue the issue to the Rules Committee (and thus to the Florida Senate).  In particular, Plaintiff repeatedly informed the Rules Committee that Defendant DeSantis had withdrawn the issue and also presented substantive argument that, in his opinion, conclusively disproved the allegation.

This Court concludes Plaintiff has not stated a procedural due process claim with respect to the emergency radio system.  The gravamen of Plaintiff's argument is that Defendant DeSantis withdrew the allegation; but, as this Court has explained, the issue is not whether the Rules Committee and/or the Florida Senate breached Florida's state-law procedural rules.  The issue is whether Plaintiff received notice of the allegations and a meaningful opportunity to be heard and clear his name.  By way of analogy, Plaintiff was not told he would be tried for robbery, only to show up for trial and learn he was in fact being tried for murder.  Plaintiff received meticulous notice of the charges against him through the executive order of suspension and the bill of particulars, including those concerning the emergency radio system.  He had an opportunity to subpoena and depose witnesses, to gather and present evidence in his defense, and seized that opportunity with such force that Defendant DeSantis himself was apparently convinced.  *Cf. Nash*, 812 F.2d at 664 (holding, in part, that an opportunity to present contrary evidence to discredit adverse testimony satisfied due process); *Campbell v. Pierce Cty.*, 741 F.2d 1342, 1345 (11th

63

Cir. 1984) (explaining post-termination hearings involving liberty interests require only "that the claimant have notice of the charges which have been raised against him, and an opportunity to refute, by cross-examination or independent evidence, the allegations which gave rise to the reputational injury"). The Special Master agreed with the result, if not with all the particulars, and told the Rules Committee as much. Plaintiff then argued the matter before the Rules Committee, pointing to the allegedly overwhelming evidence that was before the Rules Committee, responding to the merits of the allegation about the emergency radio system and not resting solely on Defendant DeSantis's withdrawal of it. Applying *Mathews*, the interest at stake was weighty indeed, but the risk of an erroneous deprivation through the procedure Plaintiff alleges he received was appropriately controlled for by that very substantial procedure, and further procedural protection in the form of additional opportunities for discovery, argument, or confrontation would not add much probative value. This Court concludes Plaintiff fails to state a claim as to this issue

<u>No-Confidence Vote</u>

Fourth, Plaintiff alleges the Rules Committee considered the results of a no-confidence vote in Plaintiff held by a union of BCSO employees. ECF No. 1 at 15. This vote received brief discussion at three points in the Rules Committee meeting. The first was during the questioning of the Special Master, who stated Defendant

DeSantis had not presented him with any evidence about it.  ECF No. 90-2 at 61–62.  It is unclear how the evidence of this no-confidence vote arose, but the most favorable inference to Plaintiff would be if Senators discovered it during the course of independent research or discussions with outside sources, such as a communication with Defendant DeSantis's office.  Accordingly, this Court will assume that is how the members of the Rules Committee learned of it.  Later, a second Senator raised the point, and asked whether the Special Master was "aware that that [sic] particular vote involved only twenty percent of [BCSO] officers and only one union, and that there were other officers who were not at all involved in that vote?"  *Id.* at 79.  The Special Master again said he had "no knowledge of that," and further explained that he did not think it was relevant in any case.  *Id.* at 79–80.  During public comment before the Rules Committee, a relative of one of the slain students made an isolated reference to this vote, saying only "[t]he International Union of Police Association, six hundred and twenty deputy union was right in voting no confidence in [Plaintiff]."  *Id.* at 406.  The no-confidence vote was not mentioned at all during the full Senate's debate.  *See generally* ECF No. 90-4.  To the extent Plaintiff alleges the Rules Committee considered this union vote, therefore, the attachments support that allegation.  To the extent, however, Plaintiff alleges he had no opportunity to respond to this issue, the attachments contradict the complaint.

Taking the complaint and the attachments in the light most favorable to Plaintiff, this Court concludes Plaintiff fails to state a claim with respect to the Florida Senate's consideration of the no-confidence vote.  As explained below, due process under these circumstances does not prevent individual Senators from conducting independent research, so the inclusion of this information was not problematic in that sense.  Plaintiff also had a meaningful opportunity to respond to this information during his presentation to the Rules Committee, though Plaintiff chose not to avail himself of that opportunity—perhaps because the Senators and the Special Master had done so for him.  *Cf. Nash*, 812 F.2d at 664 (explaining that the appellants' failure to "avail themselves of the opportunity to question the witnesses through the chancellor cannot be characterized as a denial of process").  Plaintiff's claim as to this issue attempts to cloak a relevance objection in due-process drapery, and it lacks merit.  Taking the complaint and attachments in the light most favorable to Plaintiff, this Court concludes Plaintiff has failed to state a claim with respect to this issue.

<u>Independent Research and Knowledge</u>

Fifth, Plaintiff claims the consideration of "separate and undisclosed 'research' by members of the Florida Senate" violates his due process rights.  ECF No. 1 at 15.  Several Senators alluded to independent research they had done, both in the Rules Committee meeting and in the full Florida Senate's debate.  *See, e.g.*,

ECF No. 90-2 at 64, 92 (mentioning newspaper articles), 141, 310, 313; ECF No. 90-4 at 112–13. As this Court noted above, some Senators appear to have become aware through independent research of a no-confidence vote in Plaintiff held by a particular union. Some Senators also specifically mentioned outside knowledge of the underlying facts because of other activities they had undertaken in their official capacities. ECF No. 90-2 at 95, 183. One even alluded to anecdotal knowledge of correct law enforcement practices. *Id.* at 45 ("In fact, that's because *history shows* that the killer, when confronted, will either often, usually either shoot himself or engage the individual who is engaging the killer, therefore, saving innocent lives, right?" (emphasis added)).

As pleaded, this Court could interpret Plaintiff's claim as to this issue in three ways. First, Plaintiff might mean to argue that due process forbids the Florida Senate from considering any outside research, limiting it to a passive role of receiving information. But "[l]egislatures are not constituted to conduct full-scale trials or quasi-judicial proceedings and we should not demand that they do so." *Groppi v. Leslie*, 404 U.S. 496, 500 (1972). Legislatures are confronted with important and highly detailed questions of fact in the ordinary course of their business, and they have tools and infrastructure to address those questions. That those tools are not the same as those a court would employ does not automatically render them problematic in a due-process sense. And even though it is not literally a court, the Florida Senate

67

was asked in this case to consider certain thorny legal questions, such as the meaning and applicability of section 30.07, Florida Statutes.  Under *Mathews*, this Court fails to see how forbidding Senators from conducting their own research would reduce the risk of an erroneous deprivation—in fact, it could only increase those risks.

Second, Plaintiff might be contending the Florida Senate violated his due process rights by considering its independent research without first notifying him of the specific information that research uncovered and providing him an opportunity to respond to each item of information.  Balancing the *Mathews* factors, this Court concludes such an exhaustive process would consume significant time and resources for little gain.  This Court is unpersuaded by Plaintiff's attempt to shoehorn disclosure requirements similar to those in the Federal Rules of Civil Procedure into an executive suspension and removal proceeding.  Given the detailed notice Plaintiff had of the charges against him, the length of time in which he had to prepare his defense, and the exhaustive opportunities Plaintiff had to develop the facts supporting that defense, requiring the Florida Senate to provide him additional notice of the results of its research before Plaintiff's counsel had the opportunity to address it before the Rules Committee would be an unnecessary burden on the Florida Senate and the parties before it.

Third, Plaintiff might contend the outside research gave Senators knowledge beyond the record presented to the Special Master, and that such knowledge should

disqualify those Senators or in some other way renders the Florida Senate an unfair tribunal. This lacks merit. Even in a criminal case, a defendant is entitled to a fair and impartial jury, not a wholly ignorant one. *See Skilling v. United States*, 561 U.S. 358, 381 (2010) ("Prominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*."). During his presentation to the Rules Committee, Plaintiff's counsel admonished the Senators that they ought to focus their consideration on the evidence before the Special Master and accord that evidence greater weight than any other information presented— effectively, Plaintiff's counsel gave a curative instruction. ECF No. 90-2 at 313–18. The Florida Senate may wish to exercise its discretion to make rules providing for the exclusion, in future removal proceedings, of Senators who have substantial knowledge of the underlying facts, either through investigations they conducted while sitting on other committees or for some other reason; but, in weighing the *Mathews* factors, this Court cannot conclude due process requires the Florida Senate to do so.

Accordingly, taking the complaint and its attachments in the light most favorable to Plaintiff, this Court concludes Plaintiff has failed to state a claim as to this issue.

Comments from the Public

Sixth, Plaintiff claims the Florida Senate failed to afford him due process when it considered comments from members of the public without giving him prior notice of the content of those comments, meaning Plaintiff had "no opportunity to adduce corrective or countervailing information."  ECF No. 1 at 15.

After the Special Master's report and the parties' presentations and before holding debate, the Rules Committee heard almost two hours of comments from members of the public on the subject of whether to remove or reinstate Plaintiff.  *See* ECF No. 90-4 at 25 (Rules Committee Chair Benacquisto, describing the sequence of proceedings); *see generally* ECF No. 90-2 at 333–422 (transcript of public comments).  Some members of the public commented in favor of Plaintiff, while others supported removing him.  Some were quite vehement, on both sides.  *See, e.g.*, *id.* at 337 (in favor of removal), 338 (in favor of reinstatement).  Among the members of the public who presented comments were relatives of students slain in the Marjory Stoneman Douglas High School shooting, and one victim of that shooting who was wounded and survived.  *Id.* at 371.  These comments were often very emotional and on occasion asked the members of the Rules Committee to place themselves in the victims' shoes.  *See, e.g.*, *id.* at 397.  It is inconceivable these comments did not influence the Senators to some degree.

70

Before the public comments began, Plaintiff's counsel told the Rules
Committee that he

> recognize[d] the obligation of the Senate to hear from the public.  I
> think it's an important aspect, but the Senate can't be distracted from
> the evidence that was presented by the [G]overnor, and I mean that
> respectfully, that everybody who speaks as a member of the public is
> certainly entitled to speak, but it doesn't rise to the level of evidence to
> be considered by the Senate in deciding whether the [G]overnor has
> proven [his] case.

*Id.* at 316–17.  Some support exists in the law for treating this failure to object as a

waiver of the point Plaintiff now raises.  *See Nash*, 812 F.2d at 662 (explaining any

due-process objection to the timing of the hearing had been waived by the "express

agreement" and "acquiescence" of the plaintiffs to the timing).   But even if

Plaintiff's counsel did not waive the issue, and if this Court interprets his statement

as a sort of curative instruction to the Florida Senate, the fact remains that Plaintiff

was on notice that the Rules Committee would hear public comments and that

Plaintiff had a meaningful opportunity not just to offer evidence to counter the

substance of those comments but also to make argument to the Rules Committee

about the weight to assign to them.  *See id.* at 664 (explaining "appellants presented

statements and witnesses in their behalf, the testimony of whom, if given credence

by the board, was itself capable of challenging the inferences suggested by the

testimony of the accusing witnesses").  Furthermore, these members of the public

were offering comment, not testimony.  They were not witnesses whose statements

are proper only insofar as they make a fact in issue more or less likely.  Instead—as Plaintiff acknowledged—they are an important part of the Florida Senate's proceedings.   Applying the *Mathews* framework to this question, this Court concludes the burden of collecting and providing Plaintiff with notice of the substance of public comments would be significant and impractical, would not improve the probative value of the proceedings, and would not materially reduce the risk of an erroneous deprivation.   The substantial discovery process Plaintiff undertook, together with his multiple stages of opportunity to introduce and argue the facts supporting his defense and contradicting any unfavorable public comment, were more than sufficient here.   Accordingly, this Court concludes Plaintiff has failed to state a claim as to this issue.

## *"Ex Parte"* Communications

Seventh and finally, Plaintiff alleges "unknown but admitted *ex parte* communications by the Governor's Office with individual Senators that were never disclosed to [Plaintiff] and the content thereof [ ] never made a part of the Senate record" violated his right to procedural due process.  ECF No. 1 at 15.  Defendant DeSantis's counsel made the existence of these contacts a matter of record before the Rules Committee, saying

> I've met with many, many [S]enators on both sides of the aisle, and I've talked about, you know, our theory of the case. I'll be very up front on that. I'm not shy about that, because nobody gave up their right to petition the government, including the [G]overnor, so that's just part of that process.

ECF No. 90-2 at 175–76. Various Senators also acknowledged they had been in contact with individuals representing Defendant DeSantis, and with members of the public not affiliated with the parties who gave input outside of the Rules Committee meeting. *See* ECF No. 90-4 at 33, 37, 48–49, 98, 108–09.[23] For the most part, the content of those communications is not part of the record. Plaintiff's counsel, meanwhile, explicitly disavowed having any contact with Senators outside the Rules Committee meeting. "None. And if I could just expand, when I say none, not [Plaintiff's counsel], not any person acting on behalf of [Plaintiff]. None." ECF No. 90-2 at 290. Plaintiff's counsel explained he had not engaged in such contacts because he did not believe it should be allowed. *Id.*

Plaintiff leans heavily on several cases to support his argument that contacts between Defendant DeSantis and individual Senators were improper. The first is the Supreme Court of Florida's rejection of Plaintiff's quo warranto challenge to his suspension, in which the majority explained the Florida Senate "is nothing less than a court provided to examine into and determine whether or not the Governor

---

[23] One Senator on the Rules Committee mentioned receiving a phone call asking "Have you read Dudley's report?" referring to the Special Master's Report and Recommendation. ECF No. 90-2 at 441. The Senator did not say whom the call was from.

exercises the power of suspension in keeping with the constitutional mandate." 269 So. 3d at 495 (quoting *Hardie v. Coleman*, 155 So. 129, 134 (Fla. 1934)). This, Plaintiff contends, means the Florida Senate is acting as a court in the sense of being a duly constituted judicial tribunal, with all the grave legal responsibilities implicit in that status, including the duty to prohibit *ex parte* communications. But Plaintiff's reading of this language goes too far. The Supreme Court of Florida did not hold the Florida Senate was literally a court during its consideration of an executive suspension. Read in the context of the surrounding language, and the remainder of the opinions in *Israel*, the statement is obviously metaphorical and expressive only of the fact that the Florida judiciary will not invade the sound discretion of its coordinate legislative branch by reviewing its ultimate determination in an appeal. The Supreme Court of Florida did not hold, for example, that the Florida Senate's proceedings were governed by the Florida Rules of Civil Procedure or the Florida Rules of Judicial Administration, which they would be if the Florida Senate were a duly constituted judicial tribunal. Plaintiff does not dispute that the Florida Senate's proceedings were governed by its own procedural rules and precedents. And if the Florida Senate were literally a court for these purposes, it would be exercising judicial power—but the law makes clear the Florida Senate exercises *executive* power in a removal proceeding. *Joughin*, 138 So. at 395 ("The power of removal being executive *and in no sense judicial*, the courts will not interfere with the

executive or the Senate in the performance of this function." (emphasis added)). Though analogies to familiar judicial procedures are occasionally useful in describing the conduct of executive suspension and removal proceedings, the law does not support taking those analogies literally. The Supreme Court of Florida's reasoning in *Israel* does not support Plaintiff's argument.

The remainder of Plaintiff's cases are similarly unhelpful. They do not conclusively snuff out his claim as to this issue, but neither do they support it. They either analyze the issues presented under inapplicable statutes or in easily distinguishable situations, and thus fail to move the needle. *See Morgan v. United States*, 298 U.S. 468, 477–78 (1936) (analyzing statutory requirement of "a full hearing" and explicitly declining to reach due process question); *Richardson v. Perales*, 402 U.S. 389, 410 (1971) (holding, in part, that consultants' reports could be admitted and relied upon in a Social Security Administration benefits proceeding because the petitioner could have subpoenaed and cross-examined the consultants, though he did not, and the reports were otherwise relevant); *PATCO v. Fed. Labor Relations Auth.*, 685 F.2d 547, 563–68 (D.C. Cir. 1982) (analyzing whether certain *ex parte* communications between a federal agency and interested parties violated the Administrative Procedure Act); *United Air Lines, Inc. v. Civ. Aeronautics Bd.*, 309 F.2d 238, 240–41 (D.C. Cir. 1962) (analyzing whether a party's conduct before the CAB violated that body's rules of procedure). This case is not before this Court

on a claim arising out of a federal regulatory statute or the procedural rules of an administrative agency.  This is a due process claim, and this Court must analyze it as such.

Turning to the *Mathews* analysis, it would be naïve to suggest the risk of an erroneous deprivation is not to some extent heightened by off-the-record communications between the parties in an executive suspension proceeding and individual members of the Florida Senate.  The system our society uses to resolve official disputes—that is, the judicial system—is organized around the principle that an adversarial process is the most likely to discover the truth and avoid an erroneous determination.  In general, therefore, due process favors procedures which allow a party to respond to their opponent's arguments and correct any misapprehensions the decisionmaker might otherwise be led into through the innocent mistakes or bad faith of the opposing party.  Additionally, there is value in having controversies disputed in an open and transparent way, building and reinforcing public faith in the fairness and rectitude of the results (and the institutions which arrive at them).  This is particularly true in the context of executive suspension and removal proceedings, which by their nature involve highly charged questions of the public good and the use of peremptory official authority with little opportunity for review or oversight.

This must balance, however, against what the third element of the *Mathews* analysis directs this Court to consider under these circumstances.  At the risk of

76

committing a tautology, it is important to remember that the Florida Senate is one chamber of a state legislative body.  The function of removing or reinstating a suspended official is one the Florida Senate performs with all the usual tools at its disposal, including the ability to hear from constituents and interested parties regarding the relative merits or disadvantages of a particular course of action.  The Florida Senate also is to a large degree master of its own schedule, and given the crowded nature of that schedule and the costs inherent in conducting legislative business, this Court must also be mindful of the Florida Senate's discretion and authority to operate in an orderly and efficient fashion, and to use its characteristic methods of operation in reaching its determinations on issues within the sphere of its authority.

Taking the above into consideration, this Court concludes due process does not require an absolute ban on communications between a party and individual Florida Senators in an executive suspension and removal proceeding.  This Court is certainly troubled, as anyone would be, by the notion that off-the-record discussions might subvert a determination of the merits of an issue of great public importance, especially given the lack of appellate remedies.  In the due process context, however, the existence of such communications is not the end of the inquiry.  The fundamental question is still whether Plaintiff had a meaningful opportunity to be heard on the merits of the allegations against him, and thus a meaningful opportunity to clear his

name.  Here, although the exact content of the communications between Defendant DeSantis and individual Florida Senators is not on the record, the attachments do reflect the general nature of those communications and show they were in the nature of argument about Defendant DeSantis's theory of the case.  And Plaintiff not only had a remarkably full and complete opportunity to present his case, he also had notice that the parties were allowed to meet with individual Senators and argue their case but chose not to avail himself of that avenue.  This Court appreciates the principled stand underlying Plaintiff's decision—principles reflected in this Court's concerns about fairness and transparency, expressed above.  It is not this Court's place to say whether the Florida Senate's procedure was ideal, nor whether it mirrors what this Court would have done in the Florida Senate's place.  The only issue is whether it satisfied the requirements of due process.  Balancing the *Mathews* factors, although the existence of such communications gives rise to significant concerns about the integrity of Florida's suspension and removal process in the abstract, the panoply of other procedural protections Plaintiff was afforded during this process outweigh those concerns.  Plaintiff had notice of the allegations against him and of the substance of the communications between Defendant DeSantis and individual Senators, and he had a sufficient opportunity to respond to both—not just in his presentation to the Rules Committee, but by taking advantage of his own opportunity to communicate with individual Senators.  Plaintiff's choice not to take advantage

78

of all the tools at his disposal is not a due process violation.  Accordingly, this Court concludes Plaintiff has failed to state a claim as to this issue as well.

## Conclusion

This case comes before this Court in an unusual procedural posture, and it presents this Court with an unusual task.  Rather than saying what the law *is*, throughout its analysis of Defendants' motions this Court has found itself in the position of saying what the law *is not*.  Plaintiff does not have standing to bring this suit against Defendant DeSantis.  This case does not present a political question or other nonjusticiable issue.  Removing Plaintiff from office is not a legislative act and Defendant Galvano is not entitled to legislative immunity against this suit.  And finally, the Due Process Clause does not require a suspended official to receive process amounting to a full-blown civil trial, with all the attendant strictures and procedural protections, before the Florida Senate can remove that official from office.  As alleged in the complaint, Plaintiff had several months' notice of the charges against him; he had the opportunity to subpoena witnesses, take depositions, cross-examine witnesses, present substantial documentary evidence, and had repeated opportunities to both argue his case and respond to Defendant DeSantis's arguments, both orally and in writing.  Plaintiff has failed to state a procedural due

process claim against Defendant Galvano.[24]   Plaintiff seeks to use the Due Process

Clause to transform the Florida Senate's removal proceedings into an appeal from

the Special Master's hearing, with the Florida Senate being bound to the record

before the Special Master and serving the limited role of reviewing his conclusion

according to a narrow set of delineated rules; but the Due Process Clause imposes

no such restrictions.  Taken in the light most favorable to Plaintiff, the allegations in

the complaint and the information in the attachments show Plaintiff had notice of

the allegations against him and numerous meaningful opportunities to be heard,

respond to the allegations, and vigorously argue his positions.  Due process does not

guarantee a perfect process, nor any particular process, and Plaintiff cannot use the

Due Process Clause to force the Florida Senate to provide him a more exhaustive

procedure just because he believes it would have been better to do so.  This Court

does not decide today whether the process Plaintiff received was perfect, whether it

could have been made better, or even if it was what Florida law required.  All this

Court decides is that, taking the facts alleged in the complaint—and as supplemented

---

[24] This Court dismisses Plaintiff's claims against Defendant Galvano without prejudice. This Court cautions Plaintiff's counsel, however, that compliance with Rule 11 of the Federal Rules of Civil Procedure means Plaintiff's counsel may not replead around facts he knows to exist. *But see Hoefling*, 811 F.3d at 1277 (holding a district court may not consider the attachments to a prior complaint when ruling on the merits of a motion to dismiss a subsequent amended complaint). Whether an amended complaint would state a claim is one matter, but the requirements of Rule 11 are quite another.

by the voluminous attachments to the complaint—in the light most favorable to Plaintiff, it does not state a due process claim.  Accordingly,

**IT IS ORDERED:**

1. Defendant DeSantis's Motion to Dismiss, ECF No. 24, is **GRANTED IN PART AND DENIED IN PART** and Plaintiff's claims against Defendant DeSantis are **DISMISSED** for lack of standing.

2. Defendant Galvano's Motion to Dismiss, ECF No. 23, is **GRANTED IN PART AND DENIED IN PART** and Plaintiff's complaint is **DISMISSED without prejudice** for failure to state a claim for which relief can be granted.

3. **On or before Friday, May 15, 2020**, Plaintiff shall file either (1) an amended complaint; or (2) a notice stating his intention not to file a second amended complaint, in which case this Court will enter final judgment consistent with this Order.

    **SO ORDERED on May 5, 2020.**

**s/Mark E. Walker       **
**Chief United States District Judge**
